# The Mayor, &c., of Allegheny *versus* The Ohio and Pennsylvania Railroad Company.

By the Act of 11th September, 1787, laying out the town of Allegheny, the title to the one hundred acres reserved for a "common pasture," remained in the state, the lot holders being entitled to pasturage.

Both these titles were *legal* ones, and the lot holders could assert their rights in a court of law, nor was the state constituted a trustee for them.

The Act of the 13th April, 1840, conveyed the title of the Commonwealth to the City of Allegheny, subject to the easement of the lot holders, and for such public uses as were recited in the Act of 1787.

Under these acts the Select and Common Councils of the City of Allegheny had authority to grant a portion of the land to a railroad company for the bed of the railroad, such being a public use within the meaning of the authority conferred on the city councils. BLACK and KNOX, Js., dissenting.

The authority to the city councils to make such grant, is further contained in the Act of the 11th April, 1848, by which the Act of the 11th February, 1848, passed by the legislature of Ohio, is made a law of this Commonwealth. BLACK and KNOX, Js., dissenting.

A grant made by the Commonwealth, or by a municipal corporation under authority derived from the Commonwealth, is to be taken most strongly against the grantee, and nothing is to be taken by implication against the public, except what necessarily flows from the nature and terms of the grant.

A grant of a right of way fifty feet wide for a railroad through a small strip of land in a densely populated city, will only convey so much ground as

[Mayor of Allegheny *v.* Ohio & Pennsylvania Railroad Company.]

is necessary for the line of the road, and will not carry by implication the right to erect within such line, depots, car-houses, or other structures for the convenience or business of the road.

Such grant does not confer on the railroad company, the right to permit their cars and locomotives to remain on the tracks of their road within the fifty feet, for a longer time than is necessary to receive and discharge freight and passengers.

If the company stop their trains on the common, for the purpose of receiving and discharging freight and passengers, without providing necessary and suitable accommodations, within their prescribed limits, by which the common is trespassed upon, by their agents or customers, they become parties to the intrusion.

THIS was a bill in equity filed by the Mayor, &c., of the City of Allegheny against the Ohio and Pennsylvania Railroad Company, praying for an injunction to restrain the company from using certain grounds in the said city, called the "South Common," in the manner they were then doing. The bill set forth in substance, that pursuant to the provisions of an Act of Assembly, passed the 11th of September, 1787, a town was laid out opposite "Fort Pitt," and adjoining it. One hundred acres were reserved as a common pasture. That the lots were sold, and the owners became entitled to the right of common upon this reservation: and that by the 20th section of the Act of the 13th of April, 1840,. the right of the Commonwealth to all the lands in the City of Allegheny, except such as had been appropriated by grant and by authority of law, became vested in the said city, for such public uses as were recited in the Act of 1787, and such other public uses as the Select and Common Councils might from time to time enact and ordain; with a proviso that no part of the common shall be applied to any other purpose without releases first had from such persons as might by law grant a right to the whole or any part of said common.

That the defendants being a corporation created by Acts of Assembly of the states of Ohio and Pennsylvania, and wrongfully intending to appropriate the common to their use, located their railroad over, through, and upon this common, passing along the south side of it to Federal street. And that the defendants pretend that on the 15th day of August, 1850, a resolution was passed by the councils of the City of Allegheny to the effect following:

"Resolved, by the Select and Common Councils, that as far as the title of the city extends, the right of way fifty feet wide through the common of the city to Federal street, along the south side of the South Common, as the same had been located by the said company, shall be granted to said company free of charge:" whereas no such resolution had been passed, and if it were passed by the councils, that the releases required by law had not been obtained.

And that the corporation, under colour of such pretended resolu-

[Mayor of Allegheny *v.* Ohio & Pennsylvania Railroad Company.]

tion, had entered upon the common and laid down and constructed three railroad tracks upon it, and appropriated to their use a space more than fifty feet wide along the south side of the common to Federal street, and have continued to disturb and destroy the peaceable and quiet use of it, and have appropriated the same to their use for their railroad, cars, engines, locomotives, horses, carriages, wagons, &c., for carrying on their traffic and business. And intend and threaten to erect upon it buildings for car-houses, depots, and other structures.

The bill further charged the erection of a stone wall and platform on the common, and alleged that it was destructive of the use of the common, and that it was used by the company for the receipt and delivery of freight and passengers, and greatly diminished the value of the lots in the city fronting upon the common, and that it will be a great and irremediable nuisance.

And the bill further charged that the company kept their freight and passenger cars standing upon the common day and night, and receive and discharge freight there and use it as a place of receipt and deposit; and that the great noise, steam, and smoke of their locomotives and trains, and the collection of wagons, horses, and carts and other vehicles, and by the receipt and discharge of horses, cattle, sheep, freight, and passengers, in and upon the common, they deprive the lotholders of the peaceable and quiet use of the common and of their own habitations.

The complainants deny the power and authority of the company under the resolution of the councils to use the common in the manner charged in the bill, and that the powers therein conferred have been fraudulently exceeded by the company, and that the said acts are contrary to equity and good conscience, and tend to the manifest wrong, nuisance, and irremediable injury of complainants, for which they have no adequate remedy at law, and concludes by a prayer for an injunction and for general relief.

The respondents in their answer alleged that they were authorized under the resolution of the Select and Common Councils of the City of Allegheny to occupy and use the said common with their road in the manner they had heretofore done. That the construction and occupancy of the road was with the knowledge and acquiescence of the city, and that the pasture on the common, which it was alleged was interfered with and destroyed, was of no practical or appreciable value.

The erection of the platform, as charged in the bill, was admitted, but it was denied that it in any way interfered with the use of the common by those who had the right of pasturage. They further admitted, that they kept their cars, engines, &c., standing upon the track or tracks of their road, over and on the common, for the purpose of receiving and discharging freight and passengers, and claimed a right to do so, but denied the use of the

[Mayor of Allegheny *v.* Ohio & Pennsylvania Railroad Company.]

ground of the common outside of their track or road as a depository for freight, &c., and allege that they are not in any manner responsible for the use which may be made of it by others who resort to their road, for the purpose of leaving or carrying away freight or passengers.

The answer further admitted that the company intended to extend their road from its present terminus to the city of Pittsburgh, as they are authorized to do by their charter, and alleged their right to appropriate so much of the common as shall be found necessary for the lawful purposes of the road, making compensation to the owner or owners of the same, or to the holders of the rights or easements in the common.

They further alleged that the councils of the City of Allegheny had full power and authority to make the grant, as contained in the resolutions of those bodies, and that, under said authority, and the power contained in their charter of incorporation, the company was fully authorized to do and perform all the acts and things complained of. And also, that after the expenditure of large sums of money by the company in pursuance of the action of the councils, the city was estopped in equity from questioning the title of the respondents, or in any way interfering with their enjoyment of the rights thereby conferred. They therefore prayed that the bill might be dismissed, &c.

To the foregoing answer the complainants filed a general replication.

Upon application, a commissioner was appointed by the court, before whom the testimony was taken, and which, so far as material to the cause, is stated in the opinion of his Honour, the Chief Justice.

*H. Hepburn* and *C. Shaler*, for complainants.

*T. Williams* and *W. S. Courteny*, for respondents.

The opinion of the court was delivered by

LEWIS, C. J.—The Act of 11th September, 1787, under which the town of Allegheny was laid out, directed the state authorities to "*reserve*, without the said town, one hundred acres for a common pasture." The lots were sold, and the reservation made, in pursuance of which, the title to the one hundred acres of land reserved for a common pasture remained, as before, the property of the state, and the lotholders became entitled to the privilege of common of pasture. The state owned the land—the lotholders the servitude of pasturage. Both these titles were *legal* ones, and not merely *equities*, requiring a trustee for their protection. The lotholders could assert their rights in a court of law, in their own names. The state was not constituted a trustee for their protection. She held the land for herself, subject alone to the easement

granted to the lotholders. She had therefore a perfect right to convey her title, such as it was, to others. In the exercise of this privilege the legislature passed the Act of 13th April, 1840. By that act "the right of the Commonwealth to all the lands within the limits of the City of Allegheny, excepting such parts as had heretofore been appropriated by grant and authority of law, was granted and vested in the City of Allegheny, for such public uses as were recited in the Act of 11th September, 1787, and such public uses as the Select and Common Councils might from time to time direct and ordain. *Provided*, that no part of the land allotted by the fourth section for a common shall be *applied* to any other purpose, without releases first being had and obtained from such persons as might by law grant a right to the whole or any part of said common."

This act vests the title to the one hundred acres in the City of Allegheny, with express authority to grant it away for such "*public uses*" as the Select and Common Councils shall direct and ordain." The railroad company is a *public* highway, for *public* use. It is upon this ground alone that the company has a right to take private property for the construction of the road, on giving compensation to the owners. The grant of a portion of the land, for the bed of the railroad, would therefore be a grant for "public uses" within the meaning of the authority conferred on the city councils. There is nothing in the *proviso* which in any manner invalidates the grant. The proviso has relation to matters subsequent, to wit, the *application* of the land by the grantee to the "public uses" proposed. The grant is valid, if made for public uses, but the property must not be "applied" by the grantee to those uses until releases be first obtained from "such persons as might by law" have a right to depasture the common. If the grantee of the city should misapply the land granted, to the injury of persons who held rights of pasturage, it is for them to complain. The city has no right to embark in the Quixotic enterprise of vindicating them. As she is neither their agent nor trustee, her acts in their behalf would not bind them. A judgment against her would not conclude them—one in her favour could not be pleaded by them to conclude the railroad company. We have, therefore, in this proceeding, nothing whatever to do with the rights of the lotholders to the privilege of pasture. When they complain of any violation of their rights, it will be time enough to consider and decide upon them. It is altogether out of place to decide upon them in this suit in which they are not parties.

But the power of the city councils to grant the land to the railroad company, does not altogether depend upon the Act of 1840. By the Act of 11th April, 1848, the 11th section of the Act of 11th February, 1848, passed by the legislature of Ohio to incorporate the railroad company, became a law of this Common-

[Mayor of Allegheny *v.* Ohio & Pennsylvania Railroad Company.]

wealth; and by that section it is provided that "if it shall be necessary to occupy any *public way* or *ground,* it shall be competent for the municipal or other officers, or public authorities *owning* or *having charge* thereof, and the railroad company, to agree upon the manner, terms, and conditions on which the same may be used or occupied." That the ground in question was "public ground" within the meaning of these enactments, is not to be doubted. It belonged to the public, and was expressly conveyed to the city for public uses. That it was *owned* by the city, and in *charge* of the city authorities, is equally clear. The city had therefore an undoubted right to grant for public use whatever title she possessed. Thus clothed with the title, and having full authority, the city councils, for a valuable consideration, granted to the railroad company the right of way through the ground in question, of fifty feet in width, so far as the right of the city councils extended. The grant is a valid one, and the city cannot now be heard to impeach it on the ground of some real or fancied easement of pasture claimed by third persons. The only questions in this case that remain are: What is the extent of the grant? and has the defendant transcended the bounds of it?

It must be remembered that the ground was public ground, owned and in charge of the public municipal authorities, for public uses. It may also be inferred that the grant was made on the application of the railroad company, and on their own representation of the quantity of ground which they deemed it necessary to occupy. In the construction of a grant it is important to have respect to the estate of the grantor, to the consideration which leads the estate, and to the recompense and loss which is sustained: Gough *v.* Howard, 3 *Bulst.* 125. Where a grant is made by the king, at the suit of the grantee, it is to be taken most beneficially for the king and against the grantee: 2 *Bl. Com.* 347; *Hob.* 243; *Hard.* 309. A grant made by the Commonwealth, or by a municipal corporation under authority derived from the Commonwealth, at the instance and for the convenience of a railroad company, is governed by the same rule of construction. Nothing is to be taken by implication against the public, except what necessarily flows from the nature and terms of the grant.

Where a right of way is granted through territories of such extent, as to render depots and stations for water and wood indispensable, at proper points within the limits of the grant, and where the land is either unoccupied or so sparsely populated, that these structures would not be likely to produce serious inconvenience, the right to erect them might be implied from the nature and extent of the grant. But the grant of a right of way through a small strip of ground, designed for public uses in a densely populated city, stands upon a different footing. Under such circumstances it is not reasonable to suppose that anything further

[Mayor of Allegheny v. Ohio & Pennsylvania Railroad Company.]

was intended by either party, than to contract for the use of so much ground as shall be necessary for the *line of the railway alone*, and that the ground so granted shall be used only for the ordinary purposes of passing and repassing thereon. This is necessarily the meaning where the grant is from the public authorities, at the instance of the grantee, and passes away the public rights. Under a statute which directed the "land used as a railway" to be taxed at a less rate than other land, it was held, that this partial exemption applied only to the *way* on which cars actually go, including merely *the line itself*, the turntables, and the sidings, and the land necessarily used for supporting this way, as for embankments, &c. But that the adjuncts, such as stations, platforms projecting beyond the adjacent width of the road, offices, engine sheds, warehouses, tanks, water-works, cranes and other fixed buildings, machinery, and works, though necessary for the working of the railway, were not a part of it within the meaning of the enactment: S. W. Railway Company v. Board of Health, 4 *Ellis & Blackb.* 189.

Keeping these principles in view, it seems plain that the grant of "a right of way fifty feet wide, through the commons of the city to Federal street," is limited to the right of passage, and to receiving and discharging freight and passengers within the fifty feet fixed by the grant. It confers on the company no authority to occupy any ground beyond the fifty feet granted; and it is incumbent on the company to enjoy their easement in such a manner as to guard against trespasses being committed on land not included in the grant, by their agents or customers, in transacting the business of receiving and discharging freight and passengers. The company, like individuals, are responsible for all the consequences to which their acts necessarily lead. If they stop their trains on that part of the road, for the purpose of receiving and discharging freight and passengers, without guarding the common from trespasses committed in arriving and departing, and in loading and unloading, and without providing suitable accommodations for those purposes, on their own ground, they become parties to the intrusion. The right to receive and discharge passengers, even within the fifty feet, exists only by implication, and is not to be carried farther than necessity requires. As the present terminus of the railway is at this point, this right would seem to be to some extent a necessary incident of the right of way. But the company have no right to occupy any part of the fifty feet by any structures except the railroad itself. They have no authority, under the contract, or otherwise, to erect, even within the fifty feet, any warehouses, depot-houses, car-houses, woodhouses, water-houses, or any other buildings for receiving or discharging passengers or freight on that part of the railroad which passes through the common. Wagons, drays, and carriages have

[Mayor of Allegheny *v.* Ohio & Pennsylvania Railroad Company.]

the privilege to receive and discharge freight and passengers on the public highways, but their owners have no right whatever to erect permanent buildings there for the accommodation of their trade in this respect. The railroad company must be governed by the same rules of law. The practice of detaining their cars and locomotives on that part of the railroad, for long periods of time, and thus using the ground for the purposes of a car-house or engine-house, is an abuse of the privileges granted by the contract. A detention for the period necessary to receive and discharge freight and passengers, and to perform the acts necessary to the right of passage, is all that is authorized. Every right of property over the fifty feet, except the right of way, and the incidents absolutely necessary to its enjoyment, remains, as before, in the City of Allegheny.

Is the railroad company transcending or threatening to transcend its privileges? The evidence shows that the company has erected a platform seventeen feet wide on the north side of the railroad on the South Common. This platform is three feet high and two hundred and eighty-two feet long, and the common ground has been graded to allow easy access to drays and wagons passing and repassing between the common and the platform. It is true, that a post and rail fence was erected on the north side of the platform in 1854, but a panel of the fence has been cut away, or otherwise removed, and since then drays and wagons pass from the platform on to the South Common. The evidence shows that the company have used their road in South Common, not merely for passing and repassing, but for depot purposes. Passengers and their baggage are received and set down on that part of the road; freight cars are there loaded and discharged; empty passenger and freight cars stand upon that part of the road at all times. Piles of timber, stone, pig metal and cast iron, steam boilers, and other machinery, barrels of salt, bundles of hay, bags of wool, and rags, with other freight received by and intended for shipment in the cars of the company, are placed on the common ground north of the railroad.

The agents of the company, the hands employed by the company, have been seen unloading the cars, and placing the freight on the common. The testimony is, that the common ground is now used by the company as a depot—that the whole of the South Common occupied by their road is used as a general depot for the storage of their cars, and the discharge of their freight. Plans of the car-house have been prepared with doors opening on the common, and the president of the company has declared in reference to the contemplated structure, that he intended to occupy the whole of the common ground along the car-house, as far as circumstances required. In speaking of the double doors opening on the common, he said that through these passengers were to be

received and discharged. It is true that Mr. Roberts, the engineer of the company, says he has never authorized persons with carts or drays to haul freight across the common on to the platform; but he admits, at the same time, that he has never "resisted or prevented it;" and the proof is that this platform, erected by the company, is used to receive and discharge freight from and upon the common, and that the company receive and discharge both freight and passengers, with their baggage, upon that part of their road. This necessarily leads to trespasses on the common, and the railroad company is answerable for the consequences thus flowing from their acts. It is not necessary to weigh minutely the evidence on this point. It is sufficient if there be reasonable ground to believe that these trespasses have existed, or are threatened. In such case, where the want of authority to justify the acts complained of is clear, an injunction to prohibit them can do the defendant no injury.

These are the views entertained by Mr. Justice WOODWARD and myself. Mr. Justice KNOX and Mr. Justice BLACK do not concur in them, but they concur in the decree to be pronounced. Mr. Justice LOWRIE takes no part in the decision, being related to parties interested.

It is ordered and decreed that an injunction be granted to restrain the railroad company and their officers, servants, and agents from occupying, for any purpose, any ground belonging to the City of Allegheny beyond the fifty feet granted to the said railroad company; and enjoining them so to transact their business as to prevent intrusions upon the said ground of the city aforesaid, by passengers, or persons coming to or departing from the cars of the said company with their freight or baggage in and about the business of receiving and discharging freight or passengers. Also enjoining the said company, &c., against permitting their cars or locomotives to remain on that part of the said railroad which passes over the said common, for longer periods than necessary to pass and repass, and to receive and discharge freight, baggage, and passengers. Also enjoining them against erecting within the said fifty feet any warehouses, depot-houses, car-houses, wood-houses, water-houses, offices, or other buildings for receiving or discharging freight, passengers, or baggage, or for any other purpose not strictly necessary to the enjoyment of the right to pass and repass along their said railroad across the said common.

The costs to be paid by the defendants.

The following opinion was delivered by '

KNOX, J.—The opinion just read declares the views entertained of this case by the Chief Justice and Mr. Justice WOODWARD. Mr. Justice BLACK and myself concur in the decree as far as it goes; but we think it is not the full measure of justice to which the complainant is entitled. Mr. Justice LOWRIE being related to persons interested in the result, takes no part in the decision.

In the case of Bell *v.* The Ohio and Pennsylvania Railroad Company, Mr. Justice BLACK, in an elaborate opinion, discussed all the questions raised in this case except the one relating to the right of the City of Allegheny to maintain a suit in her own name for the relief of the commoners.

In the opinion referred to, it appears to me to be clearly established that the railroad company has no right to occupy the Allegheny common, and that the ordinance passed by the city councils granting the right of way, was null and void, for want of power in the city to make the grant. It is unnecessary to discuss the question anew, or to repeat the reasons given by Mr. Justice BLACK, in the above-mentioned case, why the injunction there prayed for ought to have been awarded. I allude to it now for the purpose of saying that in no respect whatever has the argument in this case satisfied me that the positions there taken were erroneous, so far as they related to the law of the case. The common in question was reserved by the Act of 1787 to the lotholders for common of pasture; and when, by the Act of 13th April, 1840, the legal title passed from the Commonwealth to the City of Allegheny, it was explicitly provided that the common should not be applied to any other purpose without releases were first obtained from the commoners.

The principal object of the grant to the city was that she might represent the commoners: not to destroy, but to protect their rights. Holding the legal title, the city has the power to prevent encroachments upon the rights of the commoners, and may lawfully, in her own name, compel the removal of an obstruction to the common, placed upon it without authority of law.

Neither do I consider that it makes any difference that the company constructed its railroad over the common with the assent of the city councils. The principle of estoppel has no application to such a case. The railroad company knew, or ought to have known, that councils had no authority to grant the right of way, and that with or without their assent the appropriation of private property to the use of the company, without compensation or security, was expressly forbidden by the constitution of the state.

The act of councils, in attempting to grant that which the city did not possess, was simply void, and the effort now made by the

[Mayor of Allegheny *v.* Ohio & Pennsylvania Railroad Company.]

city corporation to restore to the commoners their property, is in the highest degree commendable, as it evinces a disposition to repair a wrong committed by the railroad company, under the sanction of the municipal authorities.

It is, in my opinion, to be regretted that the effort is not a successful one. The Ohio and Pennsylvania Railroad is a work of great public utility, and should meet with liberal encouragement in all its lawful undertakings; but when, not content to exercise the highest delegated power known to the constitution, under the restrictions imposed by that instrument, it takes private property without either making or securing compensation, the power of restraint and coercion belonging to this court should be promptly and effectually applied. I apprehend that we have no more important duty to perform than to hold incorporated companies strictly within the line of their chartered privileges, and, where they have overstepped the boundary defined by the power which created them, to compel them to retrace their steps at once.

I think the injunction prayed for in the bill should be granted; but as a majority of the court will not assent to this, sooner than have the bill dismissed, I will unite with my brethren in affording the partial relief indicated in the opinion of the Chief Justice.