## Wentz v. Philadelphia et al.

Argued June 21, 1930. Before WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*Charles Hunsicker,* for plaintiff, filed no printed brief of record.

*Franklin S. Edmonds,* for Phila. Chamber of Commerce, filed no brief.

*Augustus Trask Ashton,* City Solicitor, with him *T. B. K. Ringe, G. Coe Farrier* and *Ernest Lowengrund,* Assistant City Solicitors, for defendants.—The purpose of the intended purchase is a public purchase and not a private one.

The title to the ordinance of May 29, 1930, embraces but one subject.

The obtaining of the assent of the local authorities is provided for in the agreement and of course is a condition precedent to the carrying out of this enterprise: Newell v. Bradford City, 18 Pa. C. C. R. 465.

It is unnecessary that all the money which it may be stipulated will eventually be required must be raised and appropriated at the inception of the project.

The purposes envisaged do not constitute a diversion from the assent granted by the electors of the City of Philadelphia: Major v. Aldan Boro., 209 Pa. 247.

The city has authority to make, perform and effectuate the contract of purchase: Phila. v. Fox, 64 Pa. 169; Vidal v. Girard, 2 Howard (U. S.) 127.

The contract does not contemplate the use of any of the loan funds designated for the purchase of rail and marine terminal facilities as such, but merely as necessary adjuncts to a municipal airport.

The city's authority to lease is not limited to the authority given in the Act of 1925, but it has unlimited authority as aforesaid under the Act of 1789 and other acts to lease the property taken in trust for any of the purposes named in the trust reservation.

OPINION BY MR. JUSTICE SADLER, July 18, 1930:

The councils of Philadelphia determined that the establishment of an airport was necessary for the proper

development of the city. This conclusion was in line with that reached by other large municipalities throughout the United States, consequent upon the rapid development of carriage of passengers, mail and freight by airship. Within its territorial limits available space for such an undertaking could not be located, but a site was found, suitable for the purpose contemplated, containing 951 acres, which adjoined other land owned by the city applicable for use in connection therewith. Ten acres of the plot were within its boundaries, and the remaining and larger portion in the adjoining Delaware County. By the Act of May 12, 1925, P. L. 614, the legislature provided, "that all cities of the first class within this Commonwealth are hereby authorized and empowered to acquire by lease, purchase, or condemnation proceedings any land lying either within or, with the consent of the local authorities where such land is situated, without the limitations of said city which, in the judgment of the corporate authorities thereof, may be necessary and desirable for the purpose of establishing and maintaining municipal airdromes or aviation landing fields."

After exhaustive investigation of all possible locations, Hog Island, the tract above referred to, owned by the government, was selected, through the United States Shipping Board, as best fitted for the city's airport needs, and councils decided that it should be acquired. An ordinance, approved July 8, 1929, authorized the creation of loans for various purposes, and permitted the increase of the city's indebtedness to supply the necessary funds, subject to the consent of the electors. By section 2, it was provided that of the money so borrowed, $1,000,000 should be used "toward the acquisition of real estate for, and the construction and equipment of, an airport, in Philadelphia or adjacent counties," which expenditure was approved at a special election held September 17, 1929.

Thereafter the sum above mentioned was appropriated by ordinance to the department of public works to effectuate the purchase proposed, and, on May 29, 1930, by further enactment, council authorized and directed the execution and delivery of an agreement with the United States of America to acquire 951 acres, of which all but ten were in Delaware County, setting apart $975,000, or so much thereof as was necessary, to cover the consideration presently payable, as well as the sum required for the immediate filling up of a part of the tract, as demanded by the grantor. The contract set forth in its preamble that, "the City of Philadelphia is desirous of purchasing the said premises for use as an airport, seaplane base, and railroad and marine terminal, and to maintain the same under the authority of the said city under the laws of the Commonwealth of Pennsylvania."

Therein, the land in question was referred to as composed of three parcels, one of slightly more than 84 acres, designated as the seaplane base, situated in the Township of Tinicum, Delaware County; the second as an airport, containing 260 and a fraction acres, in the same municipality and partly in the 40th Ward of the City of Philadelphia, and the third, a rail and marine terminal, containing 610.44 acres, similarly located. Under the terms of the agreement, $450,000 was payable in cash, and, in addition, $500,000 was to be expended for needed improvement of the site. It was further stipulated that a yearly ground rent of $76,500 should be charged for the first ten years, this sum to be thereafter increased to $153,000, and the conveyance was also to be delivered subject to certain covenants to pay taxes, water rents and insurance. The capital value of these annual payments was fixed at $2,550,000, which amount the city reserved the right to extinguish in the future, if deemed expedient, whereupon all claims arising therefrom should terminate. The title was to be transferred by the government in trust for the purposes mentioned, and to be "such as will be insured by the Real Estate'

Land Title & Trust Co. of Philadelphia, in the same manner as the said title had already been insured to the United States by the same and other companies." It was further agreed that in case the premises should cease to be used as an airport the title shall revert to the United States. By proper action, the moneys presently due, if the contract became effective, were appropriated, but the right to complete the transaction was limited by the owner to 120 days from May 29, 1930, the date of the execution of the contract of sale.

The parcels purchased were to be conveyed for airport purposes, in the development of which the government was deeply interested, and therefore fixed a consideration much less than the actual market value of the land involved. The proposed transfer to the grantee "in trust" was evidently intended to designate the use to which the property should be devoted and not to indicate that the city was to become owner of the land as a technical trustee. Such character of acquisition was permissible, for the municipality was not limited to the purchase of a fee simple title. The Act of March 11, 1789, section 2, 2 Sm. L. 463, provides that the corporate authorities shall "at all times for ever, be able and capable in law to have, purchase, take, receive, possess and enjoy lands, tenements and hereditaments, liberties, franchises and jurisdictions, goods, chattels and effects to them and their successors for ever, *or for any other or less estate.*" This legislation is still in force (Phila. v. Brabender, 201 Pa. 574; Com. v. Walton, 182 Pa. 373), and the right to buy as here proposed, subject to the limitations set forth in the contract, is justified by the Act of 1789, as supplemented by that of 1925, supra. It is unnecessary, therefore, to consider the grant of power to acquire land set forth in other statutes to which reference was made on argument: Act of June 8, 1907, P. L. 488; Act of June 17, 1913, P. L. 520; the Consolidation Act of February 2, 1854, P. L. 21, or the city charter legislation of June 25, 1919, P. L. 581.

Wentz, a taxpayer, filed this bill to restrain the carrying out of the agreement, averring that the land contracted for was not intended solely for airdrome and airport purposes, but principally to establish and maintain a "railroad and marine terminal," which functions were beyond the powers conferred on the city, and not suggested in the title to the ordinance providing funds. It was insisted that the purchase committed the city to an unauthorized business venture, unconnected with airport uses, and, if attempted, would involve the expenditure of large additional amounts for a nonmunicipal purpose, the result being the unlawful pledging of the city's credit in violation of article IX, section 7 of the Pa. Constitution. A failure to secure municipal permission of the local authorities, where the land was principally located, was also averred. The last objection need not be considered since the consents of Delaware County and Tinicum Township have been now obtained, as required by the Act of 1925, and filed as a part of the record in this case. The City of Philadelphia, the mayor, director of public works, and members of city council were named as defendants in the proceeding instituted, and, because of the interests of various citizens whom they represent, the Philadelphia Chamber of Commerce, the United Business Men's Association, the Philadelphia Business Progress Association, and the Aero Club of Pennsylvania were also granted leave to appear and file briefs under Rule 61 of this court.

In view of the impossibility of securing a determination below and a review on appeal, if such was asked, before the expiration date of the option, it became necessary that prompt action be taken by this court to pass upon the validity of the contract, if the benefit of the advantageous arrangement with the government could be secured. The time for acceptance of the offer terminated prior to the convening of the regular fall session of this court, which, by rule, is fixed for September 29th. In order that the question of legal authority to buy could

be determined prior to the date limit fixed, application was made for the immediate transfer of the proceeding, which was ordered, and a hearing directed for the last day prior to the summer adjournment. That this court has original jurisdiction of a proceeding such as this, and may remove it, and dispose promptly of the entire matter, cannot be questioned. Article V, section 3, of the Pa. Constitution expressly grants such power in case of injunctions where a corporation is a party defendant, whether it be a private or municipal one: Wheeler v. Phila., 77 Pa. 338; Bruce v. Pittsburgh, 166 Pa. 152. Permission to so proceed lies within the discretion of the court (Clark v. Washington Boro., 145 Pa. 566), and will be granted only where, as here, a municipality is a proper party defendant (Dewalt v. Bartley, 146 Pa. 525), and the necessity for such action is apparent.

The case was presented at the time fixed on bill and answer, which set forth the essential and undisputed facts upon which the determination must rest. The only evidential disputes were those defining the meaning of the phrase "marine and rail facility," and the averment in the replication filed by the plaintiff denying the accuracy of a statement in the answer as to the value of the land to be acquired. Accepting in both instances the statements of plaintiff as correct, the determination of the rights of the parties, based on the uncontradicted averments, will not be affected. The hearing was proceeded with on the pleadings, the effect of which is to compel the acceptance of all pertinent allegations set forth in the bill and reject averments appearing in the answer which are in denial thereof: Kelly v. International Clay Products Co., 291 Pa. 383. The city appears to recognize this status, and declares in its brief (page 4) "there is no disputed question of existing facts appearing in the pleadings and the conclusions of fact and law arising out of the admitted facts are all questions to be determined by the court without the adduction of either oral or written evidence in the case." Assuming

the statement of intention as to the intended use of the property, and similar assertions, to be "existing facts," as indeed they must be, then these declarations of purpose must be considered as correct, and what is hereinafter said must be viewed in the light of that conclusion.

"Aeronautical development emphasizes the vital importance of 'airways,' an essential element of which is the land field or airport. The term 'airway' applies to air routes for either airplanes or seaplanes. An airway is far more than a mere air line. It is a material and permanent way through the air, laid out with the precision and care that an engineer adopts in choosing the course and laying down of a railway. Whether over land or water, it is essentially on the ground. Its existence and general layout depend almost entirely upon the commercial demand...... Municipalities are studying local conditions and commercial organizations are pressing the importance of establishing terminal airports and of providing proper lighting for landing fields, and facilities such as hangars, garages, and repair shops. The possession of the airport by the modern city is essential if it desires opportunities for increased prosperity to be secured through air commerce": Wichita v. Clapp, 125 Kan. 100, 263 Pac. 12, 63 A. L. R. 478, 482. In this case, and that of Dysart v. St. Louis (Mo.), 11 S. W. (2d) 1045, 62 A. L. R. 762, and the notes thereto, will be found the recent decisions unanimously reaching the conclusion that the development of an airport is a public function, and discussing municipal powers in regulating and making use of the same.

In this State, the power to acquire land beyond the limits of a municipality was granted by the Act of May 12, 1925, P. L. 614, and the first question arises as to the extent of the city's rights under that legislation. It empowers those of the first class "to acquire by lease, purchase or condemnation proceedings any land...... which, in the judgment of the corporate authorities thereof, may be necessary and desirable for the purpose

of establishing and maintaining municipal airdromes or aviation landing fields...... Any city acquiring land under the provision of this act may lease the same or part thereof to any individual or corporation desiring to use the same for the purpose of landing or starting an aeroplane therefrom or for other aviation purposes on such terms and subject to such conditions and regulations as may be provided," and may lease it to "the United States for the use by said government of said land for aviation, mail delivery or other aviation purposes."

The scope of this grant of power of course necessarily includes all appropriate means for the carrying out of the purposes specified, but does not go beyond that. It is well said in Lesley v. Kite, supra, page 274: "Nothing is better settled than that a municipal corporation does not possess and cannot exercise any other than the following powers: (1) Those granted in express words; (2) Those necessarily or fairly implied in or incident to the powers expressly granted; (3) Those essential to the declared objects and purposes of the corporation, not simply convenient but indispensable. Any fair, reasonable doubt as to the existence of power is resolved by the courts against its existence in the corporation, and therefore denied: Dillon on Municipal Corporations, section 89." This is quoted and followed in Fey's App., 68 Pa. Superior Ct. 40, 42; and, so far as appears, has not been qualified by any of our decisions. Where land has been legally condemned for defined public purposes, or dedicated specifically to a certain use, it may not be diverted to other service than that expressly directed, but, if set aside for the general welfare, it may be employed in any way beneficial to the citizens, so long as the use remains public, and is not in contradiction of the design for which it was originally appropriated: Laird v. Pittsburgh, 205 Pa. 1; Com. v. Connellsville, 201 Pa. 154; Allegheny v. O. & P. R. R. Co., 26 Pa. 355.

It follows that rail and marine terminal facilities may be provided in so far as, in the language of the act, they are "necessary and desirable for the purpose of establishing and maintaining municipal airdromes or aviation landing fields," but beyond this the city cannot legally proceed. It would seem from a reading of the contract that the parties did not intend the city should always be so limited, if it could secure additional power from the legislature; but it is averred in the answer "that the marine and terminal facilities contemplated by the contract are germane, incidental and collateral to its construction and operation as an airport"; and we were advised at the oral argument that, under the Act of 1925, the city did not intend to go beyond the limits above stated. The clause found in the contract cannot be considered other than a declaration of the municipal purpose, and so considered does not exceed the express powers granted by the controlling statute. If at any future time an attempt should be made under the Act of 1925, supra, to exercise more extensive rights than authorized, and to conduct a business not contemplated thereby, as suggested by plaintiff, equitable relief can be secured, for it was not the purpose of the legislature to confer upon the municipality the power to engage in a general rail or marine business, but to permit it to conduct such operations only as were incidental to the conduct of airdromes or airports.

Thus limited, the ordinance does not violate the requirements of article XVI, section 6, of the Act of June 25, 1919, P. L. 581, 603, which requires that in cities of the first class no ordinance "shall be passed containing more than one subject which shall be clearly expressed in its title." The wording of the ordinance of May 29, 1929, expressly limits its scope to the acquisition and use of property for airport purposes, and does not set forth an intention to use the land acquired for general railroad and marine shipping business. If it was the purpose of the city to conduct such an operation the title

might be well questioned, but it can be construed only as permitting such operations as are incidental to the proper operation of the airport.

The act provides for airports, which have been defined in the Federal Air Commerce Act of May 20, 1926 (clause 344, section 9, 44 Stat. 573), as follows: "The term 'airport' means any locality, either of water or land, which is adapted for the landing and taking off of air craft, and which provides facilities for shelter, supplies and repair of air craft; or a place used regularly for receiving or discharging passengers or cargo by air." If the body of the ordinance be construed in accordance with that definition it will be unobjectionable, for in granting the right to establish a municipal work, all of the incidental construction necessary to make it available for proper use is to be implied, but no more: Pioneer R. E. Co. v. Portland (Ore.), 247 Pac. 319. The joinder in the title to an ordinance, providing for the establishment of an airport, of the power to do separate things will not render it defective as setting forth more than one subject, if all are in furtherance of the same authorized purpose: Clayton Mfg. Co. v. Detroit, 34 Fed. (2d) 303.

The same limitation of the scope of the ordinance will avoid, also, the complaint growing out of the manner of submitting the question to the electors, who were asked to authorize councils to increase the city's debt by one million dollars "toward the acquisition of real estate for and the construction and equipment of an airport in Philadelphia or adjacent counties. As said in Major v. Aldan Boro., 209 Pa. 247, 252: "When, by an ordinance, the municipal authorities direct, in conformity to the constitutional requirement, the submission to a popular vote of the question of the increase of the indebtedness, the purpose for increasing it is distinctly set forth, and, in the notice of the election, this purpose again appears, and on his ticket the elector finds a brief statement of it and the amount of the increase, the borough council can-

not, after the increase is authorized by a popular vote, so cast, divert the money from the purpose for which they, in the first instance, declared it was to be used." If, however, as already quoted from the answer, "the marine and rail facilities contemplated......are [only those which are] germane, incidental and collateral to its construction and operation as an airport," then the electors knew when they acted upon the increase of the debt, that they were voting in order that the money realized should be used "toward the acquisition of real estate for and the construction and equipment of an airport," as distinguished from supplying land and shipping facilities for the general purposes of building railroads and developing the mercantile marine, and this objection also falls.

Nor can we see merit in the complaint that the purchase may, in the future, require the expenditure of moneys other than those provided for in the municipal legislation questioned. The contract expressly provides, "the said party of the second part shall proceed with the work necessary to prepare said several tracts of land for the purposes aforesaid as rapidly as funds of the said city may lawfully be used for such purposes, but no positive committal to expend money other than the $975,000 designated for specific purposes herein shall arise until such work may lawfully be authorized and money lawfully appropriated therefor." This makes it clear that the establishment of the airport, with its incidental requirements, was intended to proceed gradually, and the money to be supplied from time to time either by legal loans or appropriation from current funds as might be deemed advisable or found feasible. No obligation to make larger outlays than these provided for appears.

Finally, it is urged by the plaintiff that the ordinance violates section 7 of article IX of the Pa. Constitution, which provides that, "the General Assembly shall not authorize any county, city, borough, township or incorporated district to become a stockholder in any company,

association or corporation, or obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual." The provision quoted can have no application to the present case, where the appropriation is for a public and municipal purpose expressly authorized by act of assembly. This conclusion has been reached in other states where a like objection was made: Dysart v. St. Louis, supra; Hesse v. Rath, 224 N. Y. App. D. 344, 164 N. E. 342. The same principle is recognized in Sambor v. Hadley, 291 Pa. 395, and Com. .v. Pittsburgh, 183 Pa. 202. Though the wisdom of such action may be doubted, a municipal corporation may legitimately engage, under authority from the legislature, in furnishing, in certain cases, a public service such as is usually supplied by a private corporation; e. g., the manufacture and supply of gas, water or electricity (Linn v. Chambersburg Boro., 160 Pa. 511), and it may constitutionally negotiate loans for the purpose of acquiring or increasing the facilities in carrying on such business: Wheeler v. Phila., 77 Pa. 338. In the present case, the moneys provided for are to be used for the purchase of land for an airport, as permitted by the legislature, and declared to be a public use, and it is expressly set forth in the answer filed that the city has no intention to embark in a general rail or shipping business, but to carry on such work only as is incidental to the proper use of the airdrome. The constitutional objection can, therefore, have no weight.

The amendment to the bill, filed since the argument, requires but a brief notice. By it, plaintiff avers that an adjoining property containing some 239 acres, and forming part of a larger tract "having a frontage of approximately 3,500 feet on the Schuylkill River," is now owned, maintained and operated by the city as a municipal airport, and these facts, in plaintiff's opinion, "renders wholly unnecessary the acquisition of the 610 acres to be held, used and occupied by the City of Philadelphia as and for a railroad and marine terminal, as

provided in said ordinance and contract." Under the circumstances here appearing, it is not for plaintiff, nor indeed for the court, but for the city herself, to determine what quantity and location of land shall be used for the purposes expressly authorized by the Act of 1925. If fraud, bad faith, or what amounts to one or the other, was averred, a different question would arise, but none such is suggested by the record.

Nor do we see merit in the additional suggestion filed on July 9, 1930, since the hearing in this case, in which it is averred that no consent of the school district of Tinicum to the purchase has been filed. It is not such a local authority as contemplated by the Act of 1925, supra, whose leave to the acquisition of land for airport purposes is required. The township, within whose boundaries the school district lies, is given, by statutes, through its proper authorities, the power to hold, lease or convey real estate within its limits, and the permission of the City of Philadelphia to acquire the portion of Hog Island, located therein, has been duly granted by the "municipal authorities" designated by the act.

It follows from what has been said that the bill in the present case must be dismissed. If at any future time the City of Philadelphia attempts to exceed the powers granted to construct an airport, and such works as are necessarily allied to its operation, relief can be granted upon proper application.

The bill is dismissed at the cost of plaintiff.