## Wheeler *et al. versus* Philadelphia *et al.*

1. The Supreme Court, under the Constitution of 1873, has jurisdiction in equity to restrain a municipal corporation from doing acts contrary to law and prejudicial to the interests of the community.

2. The provision in sect. 3, art. 5, of the New Constitution, that the Supreme Court shall have original jurisdiction where a corporation is defendant, applies to municipal as well as private corporations.

3. It is optional with the Supreme Court to exercise original jurisdiction in equity, where the lower courts may entertain it.

4. A statute relating to persons or things as a class is a general law; one relating to particular persons or things of a class is special.

5. Sect. 7, art. 5, of the Constitution of 1873, prohibiting local or special legislation, does not prevent classification of municipal corporations with reference to taxation, and the Act of May 23d 1874, classifying cities according to their population, is constitutional.

6. The Gas Works of Philadelphia are property belonging to the city, not for speculation, but for the comfort of all the people; the debts contracted therefor must be paid by the city.

7. Sect. 7, art. 9, of the Constitution, that the legislature shall not authorize any city, &c., to become a stockholder in any corporation, &c., or to loan its credit, &c., to any corporation, &c., was to prevent a city from becoming jointly interested as stockholder with any company, &c., and from appropriating, &c., money, or loaning its credit to any corporation or individual.

February 1st 1875. Before Agnew, C. J., Sharswood, Williams, Mercur, Gordon, Paxson and Woodward, JJ.

[Wheeler *v.* Philadelphia.]

| 77 | 338 |
| 212 | 541 |

| 77 | 338 |
| 213 | b 51 |

| 77 | 338 |
| 217 | 4 236 |
| 32 SC | 220 |

| 77 | 338 |
| 37SC | 6 124 |
| 37SC | 6 129 |
| f38SC | b 486 |

| 77 | 338 |
| 227 | 5 372 |
| 227 | 5 373 |
| 41SC4 | 453 |

At the January Term of the Supreme Court, at the instance of Charles Wheeler and others, a rule was awarded to show cause why leave should not be granted to move for a special injunction against the City of Philadelphia, W. S. Stokley, Mayor, Peter A. B. Widener, City Treasurer, Samuel B. Hancock, City Controller, and Nathan Hilles and others, Trustees of the Philadelphia Gas Works; at the same time, at the instance of. the same relators, a similar rule was granted against the same respondents, except Nathan Hilles and others, Trustees of the Gas Works. The plaintiffs in each bill were tax-payers in Philadelphia. The object of the first bill was to restrain the city from borrowing $1,000,000, to be paid to the Trustees of the Gas Works; of the other to restrain the city from borrowing another sum of $1,000,000, to be applied to the erection of sewers.

The first bill set out:

That by art. 3, sect. 1, of the Constitution of this Commonwealth, no bill shall be so altered or amended on its passage through either house as to change its original purpose, and that "no bills, except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in its title."

By sect. 7, that "the General Assembly shall not pass any local or special law * * * regulating the affairs of counties, cities, townships, wards, boroughs or school districts, * * * nor shall they indirectly enact such special or local law by the partial repeal of a general law."

By art. 9, sect. 8, that "the debt of any county, city, borough, township, school district or other municipality or incorporated district, except as herein provided, shall never exceed 7 per cent. upon the assessed value of the taxable property therein, nor shall any such municipality or district incur any new debt, or increase its indebtedness to an amount exceeding 2 per cent. upon such assessed valuation of property, without the assent of the electors thereof, at a public election, in such manner as shall be provided by law; but any city, the debt of which now exceeds 7 per cent. of such assessed valuation, may be authorized by law to increase the same 3 per cent. in the aggregate at any one time upon such valuation."

On the 20th of April 1874, an act was passed, entitled " An Act to regulate the mode of increasing the indebtedness of municipalities, to provide for the redemption of the same, and to impose penalties for the illegal increase thereof;" providing:

Sect. 1. "Whenever the debt of any county, city, &c., shall be equal to 7 per cent. per annum upon the assessed value of the taxable property, &c., it shall be unlawful to increase the same, and all such increase shall be void, and any obligation issued for such increase, or any part thereof, shall be of no binding force upon such municipality or district, &c. * * * Provided, that any city, the debt

of which now exceeds 7 per cent. of such assessed valuation, may, under authority of law to be hereafter enacted, increase the same 3 per cent. in the aggregate at any one time upon such valuation."

Sect. 2. Any county, city, &c., may incur debt or increase its indebtedness to an amount in the aggregate not exceeding 2 per cent. upon the assessed value of the taxable property, &c.

Sect. 3. The indebtedness of any county, city, &c., may be authorized to be increased to an amount exceeding 2 per cent., and not exceeding 7 per cent. upon the last preceding assessed valuation, &c., with the assent of the electors thereof, duly obtained at a public election to be held in the said district or municipality, &c.

The plaintiffs averred that, "No part of the act provides for the increase by a city whose debt already exceeds 7 per cent. of the assessed value of its taxable property, that the debt of Philadelphia greatly exceeds 7 per cent. thereof, being in fact now 10 per cent., the assessed valuation being, on the 1st of January 1874, less than $549,000,000, and the debt more than $60,000,000. That the act is uniform in its provisions, extending to all counties, cities, &c., in the Commonwealth, and that its result was simply to give legislative expression to a certain part of sect. 8 of art. 9 of the Constitution, providing for the increase, to be determined by a popular vote of any county, city, &c., to an amount not exceeding 7 per cent. of the assessed value of its taxable property.

On the 23d of May 1874, an act was approved, entitled "An Act dividing cities into three classes, regulating the passage of ordinances, providing for contracts for supplies and work for said cities, authorizing the increase of indebtedness and the creation of a sinking fund to redeem the same, defining and punishing certain offences in all of said cities, and providing for the incorporation and government of cities of the third class."

This act provides (sect. 1): For the exercise of certain corporate powers, and having respect to the number, character, powers and duties of certain officers thereof, the cities now in existence or hereafter to be created in this Commonwealth shall be divided into three classes. Those containing a population exceeding 300,000 shall constitute the first class. Those containing a population less than 300,000 and exceeding 100,000, shall constitute the second class; and those containing a population less than 100,000 and exceeding 10,000, shall constitute the third class.

The corporate powers and the number, character, powers and duties of the officers of cities of the first and second class, and those of the third class now in existence, shall remain as now provided by law, except where otherwise provided by this act.

Sect. 11. The councils of any city of the first class, the debt of which now exceeds 7 per centum upon the asssessed value of its taxable property, shall be authorized to increase the said debt

[Wheeler v. Philadelphia.]

one per centum upon such valuation, by ordinance passed in the manner directed by this section.

The plaintiffs show that the Act of May 23d 1874, was introduced into the Senate on the 26th of February, and was known as Senate Bill No. 69.   Its title then was,

"An Act dividing the cities of this state into three classes, regulating the passage of ordinances, and defining and punishing certain offences therein, and providing for the incorporation and regulation of cities of the third class."

As it passed that body, its provisions were limited strictly to the three subjects stated in its title, viz. :—

1.  Dividing cities into three classes.

2.  Regulating the passage of ordinances and defining and punishing certain offences therein.

3.  Providing for the incorporation and regulation of cities of the third class; but no part of the bill in any way referred to the increase of the debt of a city which had already reached 7 per cent. of the assessed value of its property.

After the bill had passed the Senate, it was introduced into the House, and was amended by inserting the councils of any city of the first class the debt of which now exceeds 7 per centum of the assessed value of its taxable property, shall be authorized to increase the debt 1 per centum upon such valuation, and providing for the mode of authorizing such increased debt.   With this amendment the bill passed both houses.

The Senate having refused to concur in the House amendments, a committee of conference was appointed, which recommended that the Senate recede from its non-concurrence, and recommended the alteration of the title of the bill by inserting :—

"Providing for contracts for supplies and work for said cities, authorizing the increase of indebtedness, and the creation of a sinking fund to redeem the same."

The report of the committee of conference was adopted by both houses, and the bill was finally passed, and was approved on the 23d day of May 1874.

The plaintiffs averred that the Act of the 23d of May 1874 was so altered and amended during its passage through the House as to change its original purpose, in violation of the provision of the Constitution ; and that it became necessary to alter the title of the bill, so that it should not violate that other provision of the Constitution, viz., that the subject of the bill shall be clearly expressed in its title.

They further show that the division of the cities of this state into three classes, whereby different laws shall be applicable to these several classes, is in contravention of the constitutional provision that the legislature shall not, directly or indirectly, pass any local or special law regulating the affairs of cities, inasmuch as

[Wheeler *v.* Philadelphia.]

there is but one city in this Commonwealth—the city of Philadelphia—which contains a population exceeding 300,000.

They further show, that no provision having been made in the Act of 23d of May 1874, for submitting to the vote of the qualified electors any proposed increase of the debt of a city of the first class, whose debt already exceeds 7 per cent. of the assessed valuation of its property, so much of said act as provides for such increase without such submission is contrary to the provisions of the Constitution.

Under authority alleged to have been given by the Act of 23d of May 1874, an ordinance was, on the 18th of June 1874, introduced into the Common Council of Philadelphia, authorizing the mayor, on the requisition of the Trustees of the Philadelphia Gas Works, to borrow on the credit of the city such sums of money as they might require, not exceeding $1,000,000, which ordinance had passed both councils, and been approved by the mayor; that for the reasons heretofore set forth, the Act of 23d of May 1874, gave no valid authority to the municipal government of Philadelphia to borrow the said sum of money prescribed in said ordinance, or any other sum of money, but was, as to such end, wholly unconstitutional.

The plaintiffs also alleged that by ordinance of March 21st 1835, and subsequent ordinances, persons were authorized to subscribe for shares of the stock of a corporation, &c., to be organized for the purpose of constructing and operating gas works in said city. Said works to be constructed and operated by twelve trustees, to be elected by the councils, and the city reserved the right to take possession of the works and convert the stock into a loan when its councils might deem it expedient. Under these ordinances the requisite capital was subscribed, the works constructed, and the citizens supplied with gas. The capital arising from subscriptions to stock proving insufficient, ordinances were passed, from time to time, authorizing the mayor, on the requisition of the said trustees, to borrow money on the credit of the city and the pledge of the works for their extension. These ordinances provided for the setting apart of a portion of the profits as a sinking fund to secure the principal and interest of said loan, &c., but required the consent of stockholders before said ordinances should go into operation.

Under an ordinance of January 14th 1841, and subsequent ordinances, the city took possession of said works, and issued certificates of loan to the stockholders in lieu of their stock. More money being required for extensions, further loans for that purpose were authorized by a number of ordinances set out in the bill. The loans are still outstanding and unpaid.

By the Constitution of this Commonwealth, art. 9, sect. 7, it is provided that "The General Assembly shall not authorize any city to obtain or appropriate money for, or loan its credit to, any

[Wheeler *v.* Philadelphia.]

corporation, association, institution or individual," and by art. 15, sect. 2, "no debt shall be contracted or liability incurred by any municipal commission, except in pursuance of an appropriation previously made therefor by the municipal government."

And by the 26th sect. of Act of May 13th 1856, supplementary to the Act consolidating the city of Philadelphia, it is provided that supplies for any department of the city shall be purchased or contracted for only after advertisement for sealed proposals therefor; and such contracts are to be awarded only to the lowest bidder.

The complainants are advised that the Trustees of the Gas Works are not a municipal commission or department of the city. They are neither agents of the city, nor a department of the city acting in its sovereign capacity, and said trustees constitute an association or institution, within the meaning of the Constitution, of a private character, which was, in effect, founded by the city by vesting certain property in trustees of a declared and definite trust, upon certain defined and irrevocable conditions, with power and control over the trust property, for purposes of gain and commerce, having no aspect or incident of municipal sovereignty, and with *cestui que trusts* other than the city, who have rights, as such, paramount thereto. Hence, the General Assembly has no power *to* authorize the defendant, the said City of Philadelphia, to obtain or appropriate money for, or loan its credit to, the defendants, the Trustees of the said Gas Works ; and the said ordinance is without authority of law.

Nevertheless the defendants, to wit, the Trustees of the Philadelphia Gas Works, threaten and intend to demand the said sum of $1,000,000; and the defendants, the City of Philadelphia, acting by its officers, the other defendants, to wit, the said William S. Stokley, Mayor, &c., threaten and intend to proceed to borrow, on the credit of the city, the said sum of money, and to issue certificates therefor, in the manner prescribed by the said ordinance.

The prayer was that an injunction may be granted to restrain the defendants from borrowing the said sum of money and issuing certificates therefor ; and for general relief.

The other bill set out that an ordinance had passed the Common Council of Philadelphia, authorizing the mayor to borrow $1,000,000 to construct sewers, and that the Act of May 23d 1874, referred to in the first bill, gave no authority to the authorities of Philadelphia to borrow the money as provided in the ordinance, but that the act was unconstitutional. The bill then further sets out substantially as in the former bill; and in conclusion avers that the city, by its officers, W. S. Stokley, Mayor, P. A. B. Widener, City Treasurer, and Samuel P. Hancock, City Controller, threaten and intend to proceed to borrow, &c., the said sum of $1,000,000, for the construction of sewers, &c. The prayer was for an injunction to restrain the mayor, city treasurer and city con-

[Wheeler *v.* Philadelphia.]

troller, defendants, "from proceeding to borrow the said sum of money, and from issuing certificates therefor," and for general relief.

Chief Justice AGNEW delivered the opinion of the court, on the rule for leave to move for the special injunction.

This rule has been taken in order to inquire into our power, since the adoption of the New Constitution, to take original jurisdiction of a bill in equity to restrain a municipal corporation from doing an act contrary to law and prejudicial to the interests of the community. Under the 3d section of the 5th article of the New Constitution, the Supreme Court " shall have original jurisdiction in cases of injunction where a corporation is a party defendant." Did the convention mean by the word " corporation" one class of corporations only, and to confine the exercise of the power of injunction to private corporations? It did not say so. Did it mean so? It is a word of known legal signification, embracing public and private corporations. If private only were intended, it is a result of mere inference. On what ground can we infer that the convention used a term of art and yet meant what it did not say? That body was composed largely of lawyers, many of great professional eminence and some professionally familiar with corporations. We must presume they used the term " corporation" in view of its legal meaning, and also in view of the existing powers of the Supreme Court over corporations. It was well known to them that the power to enjoin municipal corporations against the performance of illegal or unconstitutional acts, had long existed. Judge Sergeant, referring to the equity powers in the Act of 16th June 1836, so early as the year 1844, remarked upon the 5th clause of the 13th section, that over corporations of a municipal character, that court has no general chancery control; but said, " I speak not now of the next clause, to which I am going to advert, providing especially for injunctions in certain cases, because that clause no doubt applies to all persons, corporations, municipal or otherwise, as well as individuals, and is a remedy of a peculiar character :" Hagner *v.* Heyberger, 7 W. & S. 106. The same opinion is stated by Woodward, J., in Wharton *v.* School Directors, 6 Wright 363, and in Prescott *v.* Bank of Duquesne, 12 Id. 120. In the celebrated case of Sharpless *v.* The City of Philadelphia, 9 Harris 170, no one thought of interposing the fatal argument of a want of power to restrain a municipal corporation. We have a legislative construction also in the Act of 8th April 1846, forbidding injunctions to restrain the prosecution of public works in Philadelphia, a provision wholly unnecessary if the city was not liable to be enjoined. In Wolbert *v.* The City, 12 Wright 439, the case was put directly on this act, and the want of power to enjoin not suggested. Then, in The Commonwealth *v.* Rush, Mayor of Allegheny City, 2 Harris 186,

[Wheeler v. Philadelphia.]

the power was actually exercised. So in Kerr v. Trego et al., 11 Wright 292, it was exercised where two bodies were claiming to be the Common Council of this city. Hill v. Commissioners, 1 Pars. Eq. 507, may also be referred to. The 3d sect. of the 5th art. of the New Constitution is a restriction upon the general powers possessed by this court. If it were the intention of the convention to restrict the power of injunction to *private* corporations, it was absolutely necessary to say so, or else by every rule of sound interpretation the power exists as to corporations generally. And fatal would it be to the interests of the state if there were no power in this court to prevent municipal corporations from overstepping the boundaries of their authority and trampling both laws and constitution under foot.

It has been argued that the New Constitution distinguishes public and private corporations in other sections, referring sometimes to cities and counties and sometimes to railroads and other private corporations. This, however, furnishes no argument that the word " corporation," as *nomen generalissimum*, was intended to be restricted here to private corporations; for it was necessary to distinguish in other provisions, to reach the specific intent in each. Where the convention meant to provide for a city or a county, or a private corporation specifically, it was necessary to say so. The single question upon the 3d section is, Did the convention mean to confine our original jurisdiction to private corporations? It did not say so, and there is no reason to infer an intention expressed by no appropriate language.

But should we exercise the power whenever application is made to us? We think not. There is ample provision for its exercise in the four Courts of Common Pleas of Philadelphia, with a choice among them, and with a right of appeal to us. We hold to the resolution expressed in Commonwealth v. Baroux, 12 Casey 262, and Hottenstein v. Clement, 5 Wright 504, that we are at liberty to decline jurisdiction in view of the ample remedy elsewhere, while our appellate jurisdiction necessarily requires all our time. But we do not deny our jurisdiction. Cases will arise where we must feel it our duty to act. Such we think is the case before us. An important question of constitutional legislation has arisen relating to cities of the first class. The proper interpretation of the 8th section of the 9th article of the New Constitution is in controversy, involving the power of the city of Philadelphia to incur debts for certain municipal purposes. The Court of Common Pleas has declined to decide these important questions. An appeal would be productive of great delay. In the meantime the credit of the city is uncertain. It is no reply to say that there are those who are willing to take the risk and advance the money. If their loans should hereafter be declared invalid, because of the want of

[Wheeler *v.* Philadelphia.]

power to create the debt, their present willingness will be no salve to cure their wounded expectations.

Rule for leave to move for a special injunction made absolute, and the motion ordered to be heard in the first week in February.

On the hearing, February 1st 1875, of the motion for the injunction,

*W. H. Rawle* and *E. S. Miller* argued for the plaintiff.— The bill to restrain the sewer loan is one *quia timet* a recognised head of equity : Baird *v.* Rice, 13 P. F. Smith 489 ; Page *v.* Allen, 8 Id. 338 ; Wells *v.* Bain, 25 Id. 39. The Act of May 23d 1874 is unconstitutional : Walker *v.* Potter, 28 Ohio St. 85. The Supreme Court may inquire whether the legislature has exceeded its power : Cronise *v.* Cronise, 4 P. F. Smith 255 ; Jones *v.* Jones, 2 Jones 350 : Gardner *v.* Collector, 6 Wallace 499 ; Fowler *v.* Pierce, 2 Cal. 165 ; Cooly on Constitution 135, 177 ; Page *v.* Allen, 8 P. F. Smith 354. The title of [an act must not mislead, giving the details of some provisions and omitting others : Dorsy's Appeal, 22 P. F. Smith 192.

The Act of May 23d 1874 authorizes a loan of its credit to a corporation, association or institution : Western Saving Fund *et al. v.* The City, 7 Casey 175. The city having entered into the business of manufacturing gas, put itself into the position of a private citizen : U. S. Bank *v.* Planters' Bank, 9 Wheat. 907 ; Curran *v.* Arkansas, 15 How. 304 ; Speer *v.* School Directors, 14 Wright 150 ; Philadelphia *v.* Collector, 5 Wallace 727.

*C. H. T. Collis*, City Solicitor, *G. W. Biddle* and *H. M. Phillips* (with whom were *E. S. Quinn* and *W. B. Mann*) for defendants. —The trustees of the Gas Works are neither a corporation, association or institution within the meaning of the Constitution ; they are but the agents of the city with specified powers : Walker *v.* Cincinnati, 21 Ohio St. 52 ; Pennsylvania Railroad Co. *v.* Philadelphia, 11 Wright 189.

Mr. Justice PAXSON delivered the opinion of the court, February 15th 1875.

Two bills have been filed by the complainants against the city of Philadelphia, in both of which they aver that they are citizens and tax-payers of said city. In one bill they seek to restrain the city authorities from borrowing upon the credit of the city the sum of $1,000,000, for the extension of the Philadelphia Gas Works ; in the other bill they seek to enjoin said authorities from borrowing upon the credit of the city the further sum of $1,000,000, to be applied to the construction of main sewers. The Gas Loan was expressly authorized by ordinance of the City Councils ; in the

[Wheeler *v.* Philadelphia.]

case of the Sewer Loan the ordinance has passed only the Common Council. The ordinances referred to, depend for their validity upon the Act of 23d May 1874, entitled, " An Act dividing the cities of this state into three classes," &c. For the exercise of certain corporate powers, and having respect to the numbers, character, powers and duties of certain officers thereof, the cities now in existence or hereafter to be created in this Commonwealth, are divided by the said act into three classes, as follows :

Those containing a population exceeding 300,000 shall constitute the first class.

Those containing a population less than 300,000, and exceeding 100,000, shall constitute the second class ; and

Those containing a population less than 100,000, and exceeding 10,000, shall constitute the third class.

It was further provided by the 11th section of said act, that " The councils of any city of the first class, the debt of which now exceeds 7 per centum upon the assessed value of the taxable property therein, shall be and they are hereby authorized to increase the said debt 1 per centum upon such valuation," &c.

The complainants allege as the grounds of their application, that the Act of Assembly, above referred to, is unconstitutional and void, because :—

1. It creates an unconstitutional classification of the cities of the Commonwealth, and by indirection, legislates specially for the city of Philadelphia.

2. It authorizes the increase of the city debt without submission to the popular vote.

3. The act was so altered, during its passage through the House of Representatives, as to change its original purpose.

4. The object of the act is not clearly expressed in its title.

These four grounds of objection apply to both the bills.

As to the bill to which the Trustees of the Philadelphia Gas Works are made defendants, there is another ground :

5. In authorizes the city to obtain money for, or loan its credit to, a corporation, association or institution.

It was alleged on behalf of the city that the plaintiffs had no standing in court to enable them to raise these questions, because :—

1. As to the Gas Loan, the burden can never fall on the city, and

2. As to the Sewer Loan, it has only passed one branch of councils, and may never pass the other; or it may be vetoed by the mayor.

It is unnecessary to consider these objections at length. It is too late to question the right of a tax-payer, where money is to be raised by taxation, or expended by the treasury, to proceed in equity to test the validity of the law under which the proposed

[Wheeler *v.* Philadelphia.]

assessment or expenditure is to be made. Moers *v.* The City of Reading, 9 Harris 188; Mott *v.* The Pennsylvania Railroad Company, 6 Casey 9; Page *v.* Allen, 8 P. F. Smith 338; and other cases following the lead of Sharpless *v.* The City, 9 Harris 147, have put this question at rest.

The objection that as to the Gas Loan bill the burden of the proposed loan can never fall upon the city, if true in point of fact, would turn the complainants out of court. But the facts do not justify such an assertion. The proposed loan can only be issued upon the credit of the city, and the city's certificates of indebtedness must be given therefor. The property of the complainants would be responsible for every dollar of the loan. To hold that this responsibility would not, under any circumstances, be enforced, is to assume that the business of manufacturing gas is absolutely free from all the contingencies to which every other branch of business is liable, and that the Gas Trust itself is so far above all other trusts in its own integrity, and that of its numerous employees and agents, as to render defalcations, embezzlements, and mismanagement impossible.

The Sewer Loan bill may be regarded as a bill *quia timet*, a well-settled branch of equity jurisdiction, recognised by this court in Baird *v.* Rice, 13 P. F. Smith 489, in which the passage of an ordinance appropriating any moneys, or laying any special tax in aid of the construction of new public buildings at Broad and Market streets, in the city of Philadelphia, was sought to be restrained. Also, in Page *v.* Allen, 8 P. F. Smith 338, before cited, and in Wells *v.* Bain, 25 P. F. Smith 39.

Having thus conceded the right of the complainants to file these bills, it remains to consider how far they have made out a case which entitles them to the equitable relief prayed for.

It is alleged that the Act of 23d of May 1874, offends against article 3d of section 7th of the Constitution. The material parts of said section are : " The General Assembly shall not pass any local or special law * * * regulating the affairs of counties, cities, townships, wards, boroughs, or school districts. * * * Nor shall any law be passed granting powers or privileges where the granting of such powers or privileges shall have been provided for by a general law." * * *

Without entering at large upon the discussion of what is here meant by a "local or special law," it is sufficient to say, that a statute which relates to persons or things as a class, is a general law, while a statute which relates to particular persons or things of a class is special, and comes within the constitutional prohibition.

The necessity for classification is recognised in the Constitution itself. In the article upon the judiciary, section 5th, it says : " Whenever a county shall contain 40,000 inhabitants, it shall

[Wheeler *v.* Philadelphia.]

constitute a separate judicial district." In section 12 of the same article : " In Philadelphia there shall be established for every 30,000 inhabitants, one court not of record, of police and civil causes." Again, in section 27 of the same article : " In every county wherein the population shall exceed 150,000 the General Assembly shall establish a separate Orphans' Court." We are aware that it does not follow that because classification is resorted to in the organic law, the legislature may exercise the same power. But the power existed at the time of the adoption of the Constitution ; it had been exercised by the legislature from the foundation of the government ; it was incident to legislation, and its exercise was necessary to the promotion of the public welfare. The true question is, not whether classification is authorized by the terms of the Constitution, but whether it is expressly prohibited. In no part of that instrument can any such prohibition be found.

For the purpose of taxation, real estate may be classified. Thus, timber lands, arable lands, mineral lands, urban and rural, may be divided into distinct classes, and subjected to different rates. In like manner other subjects, trades, occupations, and professions, may be classified. And not only things but persons may be so divided. The *genus homo* is a subject within the meaning of the Constitution. Will it be contended that as to this there can be no classification ? No laws affecting the personal and property rights of minors as distinguished from adults ? Or of males as distinguished from females ? Or, in the case of the latter, no distinction between a feme covert and a single woman ? What becomes of all our legislation in regard to the rights of married women if there can be no classification ? and where is the power to provide any future safeguards for their separate estate ? These illustrations might be multiplied indefinitely were it necessary. But it is contended that even if the right to classify exists, the exercise of it by the legislature, in this instance, is in violation of the Constitution, for the reason that there is but one city in the state with a population exceeding 300,000 ; that to form a class containing but one city is in point of fact legislating for that one city, to the exclusion of all others, and constitutes the local and special legislation prohibited by the Constitution. This argument is plausible, but unsound. It is true, the only city in the state, at the present time containing a population of 300,000, is the city of Philadelphia. It is also true that the city of Pittsburg is rapidly approaching that number, if it has not already reached it, by recent enlargements of its territory.

Legislation is intended not only to meet the wants of the present, but to provide for the future. It deals not with the past, but in theory at least, anticipates the needs of a state, healthy with a vigorous development. It is intended to be permanent. At no

[Wheeler *v.* Philadelphia.]

distant day Pittsburg will probably become a city of the first class; and Scranton, or others of the rapidily growing interior towns, will take the place of the city of Pittsburg, as a city of the second class. In the meantime, is the classification as to cities of the first class bad because Philadelphia is the only one of the class? We think not. Classification does not depend upon numbers. The first man, Adam, was as distinctly a class, when the breath of life was breathed into him, as at any subsequent period. The word is used not to designate numbers, but a rank or order of persons or things; in society it is used to indicate equality, or persons distinguished by common characteristics, as the trading classes; the laboring classes; in science, it is a division or arrangement, containing the subordinate divisions of order, genus, and species.

If the classification of cities is in violation of the Constitution, it follows, of necessity, that Philadelphia, as a city of the first class, must be denied the legislation necessary to its present prosperity and future development, or that the small inland cities must be burdened with legislation wholly unsuited to their needs. For if the Constitution means what the complainants aver that it does, Philadelphia can have no legislation that is not common to all other cities of the state. And for this there is absolutely no remedy but a change in the organic law itself.

This is a serious question. We have but to turn to the statute book to realize the vast amount of legislation in the past, special to the city of Philadelphia. We speak not now of what is popularly known as special legislation, private acts, &c., but of proper legislation, affecting the whole city, and indispensable to its prosperity. We may instance the laws in regard to the quarantine, lazaretto, board of health, and other matters connected with the sanitary condition of the city; the laws in regard to shipping and pilotage as affecting its commerce; laws concerning its trade, such as those that relate to mercantile appraisers, inspectors of flour, bark, beef and pork, butter and lard, domestic distilled spirits, flaxseed, leather, tobacco, petroleum; and the laws in regard to building inspectors; the storage and sale of gunpowder; laws affecting its political condition, as by the division and subdivision of wards, and the establishing of the ratio of representation in councils. We have but to glance at this legislation to see that the most of it is wholly unsuited to small inland cities, and that to inflict it upon them would be little short of a calamity. Must the city of Scranton, over 100 miles from tide water, with a stream hardly large enough to float a batteau, be subjected to quarantine regulations, and have its lazaretto? Must the legislation for a great commercial and manufacturing city, with a population approaching 1,000,000, be regulated by the wants or necessities of an inland city of 10,000 inhabitants? If the Con-

stitution answers this question affirmatively, we are bound by it, however much we might question its wisdom. But no such construction is to be gathered from its terms, and we will not presume that the framers of that instrument, or the people who ratified it, intended that the machinery of their state government should be so bolted and riveted down by the fundamental law as to be unable to move and perform its necessary functions.

The Constitution of the state of Ohio contains a prohibition of special legislation similar to our own. The question of the classification of cities under this section of their Constitution was considered by the Supreme Court of that state in Walker v. The City of Cincinnati, 21 Ohio St. 14, and such classification was held to be constitutional.

We do not think that the classification of cities, as contained in the Act of 23d of May 1874, offends against any constitutional provision.

This construction does not open the door to special legislation. It permits legislation for classes, but not for persons or things of a class. As an illustration, it could not be held to authorize the legislature to open or vacate a particular street in a city of either of the classes named in the act referred to.

If the complainants were right in their position in regard to the classification of cities, and that the act classifying cities is a special act, applicable to Philadelphia alone, it would not help them. The legislature is authorized by the express terms of the Constitution to empower by special act a city to increase its debt. The language of that instrument is "but any city, the debt of which exceeds seven per centum, may be authorized by law to increase the same." It was entirely competent for the legislature to have passed an act authorizing the city of Philadelphia, by name, to increase its debt.

This brings us to the consideration of the second objection to the constitutionality of the Act of 23d of May 1874. The 8th section of article 9th of the Constitution, provides that, "The debt of any county, city, borough, township, school district, or other municipality or incorporated district, except as herein provided, shall never exceed seven per centum upon the assessed value of taxable property therein, nor shall any such municipality or district, incur any new debt, or increase its indebtedness to an amount exceeding two per centum upon such assessed valuation of property, without the assent of the electors thereof, at a public election, in such manner as shall be provided by law; but any city, the debt of which now exceeds seven per centum of such assessed valuation, may be authorized by law to increase the same three per centum in the aggregate at any one time upon such valuation."

This section is not clearly expressed. Yet its true meaning may

be gathered with reasonable certainty. The end sought to be attained was clearly a limitation upon the debt of municipalities, and seven per centum upon the assessed value of the taxable property therein was fixed as the maximum. The fact was, however, known to the convention that at that time the debt of the city of Philadelphia and perhaps some other municipalities, exceeded seven per centum. In such instances an arbitrary provision, that there should be no further increase of the debt, might have worked great injury by the stoppage of public works already commenced and essential to the public convenience and welfare. It was therefore provided, that as to such municipalities the debt might be increased three per centum. The main controversy, however, was as to the manner in which such increase should be accomplished. Here again the distinction is preserved between municipalities whose debt is under seven per centum and those in which it exceeds seven per centum. In the former, the municipal authorities may increase the debt from time to time until two per centum has been added, provided the original debt, with the increase, does not exceed seven per centum. After the two per centum has been added there can be no further increase without the vote of the people. To illustrate :

The whole debt is not to exceed seven per centum.

We will suppose the debt to have been two per centum at the time of the adoption of the Constitution.

Two per centum may be added by the municipal authorities, making the debt four per centum.

No portion of the remaining three per centum can be added without the assent of the electors of such municipality at a public election, in such manner as shall be provided by law. But when a city, whose debt at the time of the adoption of the Constitution already exceeded seven per cent. seeks to increase its debt, it can do so only with the consent of the law-making power of the state. The Constitution has interposed the legislature between such municipality and any further increase of its debt. But when the legislative sanction has been obtained, the municipal authorities may increase the debt precisely as in the case of towns whose debt is less than seven per centum. The proposed increase here is one per centum. This clearly does not require a vote of the people. Whether it would have been necessary to have submitted the question to a popular vote, had the increase exceeded two per centum, is a question about which we express no opinion. When the point is legitimately raised we will decide it.

We regard this as the true and reasonable construction of the section of the Constitution referred to. It does no violence to any known rule of interpretation, and carries out the plain object of the section. Ingenious arguments may be based upon the relation of an article or preposition to the other language employed,

but a broader view, giving to the words their ordinary signification, and having regard to the mischief sought to be remedied, leaves us in no doubt as to the correctness of our conclusions.

We need not discuss the third and fourth points raised in the plaintiffs' bill. It is sufficient to say in regard to the third, that were we disposed to go behind the Act of Assembly and inquire into the regularity of its passage there is not sufficient proof before us, by affidavit or otherwise, to justify our interference. Nor do we see any force in the objection that the object of the act is not clearly expressed in the title. In Allegheny County Homes' Appeal, *antea* 77, it was held that " if the title fairly gives notice of the subject of the act, so as reasonably to lead to an inquiry into the body of the bill, it is all that is necessary. It need not be an index to the contents, as has often been said." Tested by this rule, we do not regard the title as fatally defective.

It remains but to consider the fifth point.

Article 9th, section 7th, of the Constitution, provides, that the " General Assembly shall not authorize any county, city, borough, township, or incorporated district, to become a stockholder in any company, association, or corporation, or to obtain or appropriate money for, or loan its credit to, any corporation, association, institution, or individual."

It is alleged that the Gas Trust is an association or institution within the meaning of this section of the Constitution, and that an Act of Assembly authorizing the city to borrow money to extend the Gas Works, offends against said section.

The relation of the city to the Gas Works is not a new subject. It has been before this court upon several occasions, and in the Western Saving Fund Society v. .The City, 7 Casey 175–185, will be found a very full history of the Gas Works, as well as an elaborate discussion of the rights of the city therein. We need not repeat what is already known to all who have investigated the subject. It is sufficient to state the conclusions which are legitimately to be drawn from what has heretofore been said and is now presented.

It is clear that the Gas Works are the property of the city of Philadelphia. All the deeds and muniments of title are taken in the name of the city. This is true not only of what may be called the original Gas Works, but of all purchases made since. The works of the Richmond Gas Company, the Germantown Gas Company, the Southwark and Moyamensing Gas Company, the Manayunk Gas Company, and the Kensington Gas Company, have all been consolidated with the Philadelphia Gas Works. The title to each of these separate works is vested absolutely in the city. No other individual or corporation has any interest in them as stockholder or part owner. The Trustees of the Gas Works have no pecuniary in-

27 P. F. Smith—23

terest in them. It is true they have the control of the management, but this is by virtue of the original contract between the city and the bondholders and for the protection of the latter. This · is the scope of the decisions in the Western Saving Fund cases. So long as the loanholders remain unpaid they have a right to demand that no change shall be made in the management, either as to the number of the trustees or their mode of appointment. But the moment the loanholders are paid the Gas Works revert to the city, and the trustees have no further duty to perform but to account with the city for their stewardship. They are agents of the city, nothing more, and their possession of the works is the possession of the city, with this qualification, that until the city pays the debt for which they are pledged, the trustees cannot be moved or disturbed in their management.

For the purposes of this case we must treat this question as if there were no trustees, and the works were operated by the city directly through officers or agents immediately under its control. Such being the case, are we to regard the Gas Works as an "institution" having a separate, recognised existence apart from the city? The affirmative of this proposition cannot be successfully maintained. The most that can be urged is, that the city is acting in a double capacity; in the one, exercising rights of sovereignty; in the other, performing the functions of a private corporation in the manufacture and sale of gas. This was the view taken of it by this court, in the Saving Fund Cases, above cited. It was said by Mr. Justice Strong, delivering the opinion of the court, 7 Casey 185: "Nor can there be any doubt that the trust existing in the trustees is a private one, and that the city of Philadelphia is to be regarded as a private corporation, so far as relates to its contract with the bondholders. It was not as a municipality that it dealt with them. As a local sovereign it had no authority to enter into the business of manufacturing and selling gas, for its sovereignty did not extend to such subjects any more than it did to almost any other manufacture." This was of course predicated of what was then before the court, viz. : whether the city, in violation of its contract with the bondholders, could take the management of the works out of the hands of the trustees. While it is no part of the ordinary and necessary duties of a municipal corporation to supply its citizens with gas and water, it is nevertheless true that it may lawfully do so. Without desiring to enter into a nice discussion of the source of its right or power to do this, the fact that it has been exercised in this and many other states for a long time unchallenged exists. Rights have grown up ; large expenditures and costly improvements made ; the health and comfort of large communities promoted thereby. The lighting of a city with gas, and supplying it with pure water, are entirely dis-

connected from wild speculations of the character indicated upon the argument.

We do not think the Gas Works have any separate entity. They resemble the Water Department and the Fairmount Park. Aside from the trustees, and they amount to nothing in our view of the case, the Gas Works may be considered as property belonging to the city, and operated, not for the purpose of speculation, but to promote the comfort of the whole body of the people. As their original acquisition and subsequent use were lawful, debts contracted therefor must be paid by the city. While, as regards the loanholder, the city may be considered as a private corporation, as between the city and her citizens, for whose benefit the works were constructed and are now used, it is of little moment whether we regard the former as a private corporation or a sovereign, legislating for the benefit of its citizens. In either event the latter are bound by the contract of the city. The constitutional provision referred to, was intended to prevent : First, the city from becoming jointly interested as stockholder with any company, association or corporation ; and second, from obtaining or appropriating money for, or loaning its credit to, any corporation, association, institution or individual. The Gas Works being exclusively owned by the city, it is clear the case does not come within the first division above stated. It appears equally plain that the latter division or clause of the article referred to was not intended to apply to cases where the corporation, association or institution had no legal existence, separate and apart from the city, and where the latter merely sought to borrow money for its own use, in the improvement of its own property, lawfully acquired, for either the comfort, health, or pleasure of its citizens.

This clause in our Constitution, as well as the one in reference to special legislation, was borrowed from the Constitution of the state of Ohio. In Walker *v.* The City of Cincinatti, before cited, the Supreme Court held, that an Act of Assembly authorizing the entire construction of a railroad by a city of the first class, where such road was material to the development of the city, and to empower the local authorities to provide means therefore by the taxation of its citizens, was not in violation of the constitutional provision referred to. Says Chief Justice Scott, in delivering the opinion of the court : " The mischief which this section interdicts is a business partnership between a municipal or subordinate division of a state, and individuals or private corporations or associations. It forbids the union of public or private capital or credit in any enterprise whatever. In no project, originated by individuals, whether associated or otherwise, with a view to gain, are the municipal bodies named permitted to participate in such manner as to incur pecuniary expense or liability. They may neither

become stockholders, nor furnish money or credit for the benefit of the parties interested therein. As this alliance between public and private interests is clearly prohibited in respect to all enterprises of whatever kind, if we hold that these municipal bodies cannot do on their own account what they are forbidden to do on the joint account of themselves and private partners, it follows that they are powerless to make any improvement, however necessary, v᾽th their own means, and on their own sole account. We may be very sure that a purpose so unreasonable was never entertained by the framers of the Constitution."

The section of our Constitution now under consideration is not new. It is substantially the same as the amendment to the late Constitution, adopted in 1857. See article 11, section 7, Brightly's Purdon 34. Since 1857 five loans, aggregating $4,500,000, have been issued by the city for the benefit of the Gas Works, without an objection on the part of any citizen. The considerations which are now urged upon us are not such as should move a chancellor to interfere, especially when there has been such universal and long-continued acquiescence.

The injunction is refused.