

# THE ATTORNEY GENERAL
# OF TEXAS

JIM MATTOX
ATTORNEY GENERAL

July 31, 1990

Honorable Bob Bullock
Comptroller of Public
  Accounts
P. O. Box 13528
Austin, Texas  78711

Opinion No. JM-1200

Re:  Effective date of amendments to section 144(b) of article 6701d, V.T.C.S., which allocates to municipalities money received from traffic fines, and related questions (RQ-2033)

Dear Mr. Bullock:

You ask a number of questions relative to the applicability of section 144(b) of article 6701d, V.T.C.S, prior to and after the date of its amendment by the 71st Legislature. Subsection (b) concerns the allocation of money received from traffic fines by municipalities.

Section 144 as amended by House Bill 243, Acts 1989, 71st Leg., ch. 233, § 1 (eff. Sept. 1, 1989), provides:

> (a) Fines collected for violation of any highway law as set forth in this Act shall be used by the municipality or the counties in which the same are assessed and to which the same are payable in the construction and maintenance of roads, bridges, and culverts therein, and for the enforcement of the traffic laws regulating the use of the public highways by motor vehicles and motorcycles and to help defray the expense of county traffic officers.

> (b) <u>In each fiscal year, a municipality may retain, from fines collected for violation of any highway law as set forth in this Act, an amount equal to 30 percent of the municipality's revenue for the preceding fiscal year from all sources, other than federal funds and bond proceeds, as shown by the audit performed under Section 103.001, Local Government Code. After a municipality</u>

has retained that amount, the municipality
shall send to the state treasurer any portion
of a fine collected that exceeds one dollar
($1). The state treasurer shall deposit
funds received under this section in the
state treasury to the credit of the general
revenue fund.

(c) Definition: 'Interstate highway' as
used herein is a portion of the national
system of interstate and defense highways
located within this state which now or
hereafter may be designated officially by the
Texas Highway Commission and approved
pursuant to Title 23, United States Code.

(d) Definition: 'Speed-measuring device'
as used herein is any 'Doppler shift speed
meter' or other 'radar' device whether
operating under a pulse principle or a
continuous-wave principle, photo-traffic
camera, or any other electronic device used
to detect and measure speed.

(e) The provision of Subsection 144(b),
shall not be applicable to any municipality
having a population of 5,000 or more inhab-
itants according to the last preceding
federal census. (Emphasis reflects amendment
by the 71st Legislature.)

Section 2 of House Bill 243 provides:

This Act takes effect September 1, 1989.
Section 144(b), Uniform Act Regulating
Traffic on Highways (Article 6701d, Vernon's
Texas Civil Statutes), as amended by this
Act, applies only to fines collected by a
municipality during a fiscal year that begins
on or after the effective date of this Act.[1]
(Emphasis added.)

---

1. West Publishing Company omitted this section in
Vernon's Texas Civil Statutes. That fact does not effect
the validity of this provision.

Prior to amendment by the 71st Legislature subsection (b) of section 144 provided:

> (b)   When a person is convicted in a municipal court of the offense of operating a vehicle on a highway in the state highway system, including an interstate highway, as that term is defined in Subsection 144(c), at a speed greater than is reasonable and prudent under the circumstances, the municipal court shall remit to the state treasurer any portion of the fine assessed and collected which exceeds two dollars ($2) times the number of miles per hour by which the offender exceeded the posted speed limit as such excess speed is determined by a speed-measuring device as defined in Subsection 144(d). The number of miles per hour by which an offender exceeds the posted speed limit is determined by subtracting the posted _prima facie_ speed limit from the number of miles per hour the offender is alleged to have driven at the time of the offense according to the summons or promise to appear. The state treasurer shall deposit funds received under this Section in the General Revenue Fund.   (Emphasis added.)

Your first question asks "Whether the 'old' § 144(b) continues in effect in each jurisdiction until the 'new' § 144(b) takes over or whether there is a gap in coverage between the 'old' § 144(b) from September 1, 1989, until the 'new' § 144(b) became effective for the next municipal fiscal year beginning after September 1, 1989."

Prior to amendment subsection (b) provided a formula for determining the division of fine money between the municipal court and the state on each speeding ticket. As amended subsection (b) contains a method for calculating the division of fine money for "violation of any highway law as set forth in this Act" based on an "amount equal to 30 percent of the municipality's revenue for the preceding year." We do not believe that the legislature intended that there be a lapse of time between September 1, 1989, and the time that a new fiscal year begins for the municipality. Section 2 of House Bill 243 expressly provides that it is applicable "only to fines collected by a municipality during a fiscal year that begins on or after the effective date of this Act." We conclude that the provisions of section 144(b)

prior to amendment remain  in effect until a  municipality's new fiscal year begins following September 1, 1989.

Your second question  concerns situations where  cities have been  incorporated less  than  twelve months  prior  to their coming  under House  Bill 243,  and cities  that  have changed their  fiscal year  less than  twelve months  before coming under the new law.  You ask what the basis should  be for calculating the allocation  of money from traffic  fines under these scenarios where there has not been a full fiscal year prior to the effective date of this act.

For cities where  a full  fiscal year  had not  elapsed prior to September 1, 1989, the determination should be made under subsection (b)  prior to  its amendment  until a  full fiscal year has  elapsed.  Where cities  have changed  their fiscal year less than a year prior to the effective date  of the amendment, we believe the legislature intended that  the allocation be made on the basis of the last full fiscal year prior to September 1, 1989.

Your third question  is what  the basis  should be  for calculating the amount  of money  from traffic  fines to  be retained by  cities  that incorporated  after  September  1, 1989.  Under this  scenario, we believe  section 144(b),  as amended by the  71st Legislature, becomes  effective at  the expiration  of  the  fiscal  year  following  incorporation. Until such time  the allocation is  based on subsection  (b) prior to its amendment.

Your fourth question  is based on  a situation where  a city has "only  recently established a  municipal court  and city budget,  although  incorporated a  full  twelve  months prior to September 1, 1989."  You ask, "how, if at all,  can these cities participate  in the revenues  allowed by  House Bill 243 where they had  no revenue during their  'preceding fiscal year.'"

We believe that section 144(b),  prior to and since  the amendment resulting from House Bill 243, contemplates that a municipality would generate revenue.  Upon establishment  of a budget  and a  municipal court,  we will  assume that  the municipality will have revenue.  Until the expiration of its first fiscal year following  establishment of a budget,  the allocation would be  based on  subsection (b)  prior to  its amendment.

Your fifth question raises  the issue of whether  House Bill 243  unconstitutionally discriminates  against  smaller

cities located on the interstate highway system since subsection (e) makes section 144(b) applicable to municipalities with populations of less than 5,000. You state that these smaller cities depend on traffic fines for a substantial portion of their revenue and they feel that they are being punished for the aggressive tactics of a few small municipalities.

You call attention to decisions of our courts that equal protection of the law is guaranteed under the United States Constitution, Amendment 14, section 1, and the Texas Constitution, article I. Sections 3 and 3a apply to persons rather than municipalities, counties, or governmental agencies created by the state. Hill v. Texas Water Quality Bd., 568 S.W.2d 738 (Tex. Civ. App. - Austin 1978, writ ref'd); Harris County. v. Downlearn, 489 S.W.2d 140 (Tex. Civ. App. - Houston [14th Dist.] 1972, writ ref'd).

We believe that the constitutional question presented is whether the statute in question violates the provision in the Texas Constitution prohibiting the legislature from passing local or special laws.

Article III, section 56, of the Texas Constitution prohibits the legislature from enacting local or special laws concerning numerous specific subjects and "in all other cases where a general law can be made applicable." Relevant to your question, section 56 prohibits any local or special law regulating the affairs of cities and towns.

In Public Util. Comm'n v. Southwestern Water Services, 636 S.W.2d 262 (Tex. App. - Austin 1982, writ ref'd n.r.e.), the court makes an in-depth examination of the constitutional prohibition against local or special laws as the law has evolved through the court's construction of this provision. In Public Util. Comm'n the court stated:

> The literal language of art. III, § 56 would require the invalidation or any statute applying to a particular locality or group because, in most cases, 'a general law can be made applicable.' However, the Supreme Court, in determining whether a specific law was local or special, has looked to the policy underlying the constitutional prohibition rather than to its literal language. Accordingly, in Clark v. Finley, 93 Tex. 171, 54 S.W. 343, 345-6 (1889), the Court refused to invalidate a statute

reducing sheriffs' and constables' fees in counties in which more than three thousand persons had voted in the last presidential election.

In Clark, the Court adopted the distinction between a general law and a special law drawn by the Pennsylvania Supreme Court in Wheeler v. Philadelphia, 77 Pa. 338 (1875), that 'a statute which relates to persons or things as a class is a general law, while a statute which relates to particular persons or things as a class is special, and comes within the constitutional prohibition.' Clark, 54 S.W. at 345 (emphasis added). This definition, of course, did not answer the question as to which particular classes were constitutionally suspect. The Court answered this question by stating the general rule that the class created by the statute must be a real class, and not a 'pretended' class created by the legislature to evade the constitutional restriction. Id. A 'pretended' class would be one which 'manifest[s] a purpose to evade the constitution.' Id. 54 S.W. at 346. Ultimately, the class created in a statute must bear a reasonable relation to the general purpose of the legislation and concern a matter of general statewide effect or interest.

. . . .

[I]n Stephensen v. Wood, 119 Tex. 564, 34 S.W.2d 246 (Tex. Comm'n App. 1931, opinion adopted), the Court determined a law prohibiting certain fishing methods in specified coastal counties was not an unconstitutional special or local law. Although the law applied to a 'closed' class of counties, this class reasonably related to the general object of the legislation, and involved a matter of statewide interest -- the management of coastal marine life.

In 1959, the Court upheld a statute authorizing counties to issue park development bonds if those counties were located on the Gulf of Mexico and contained

an island suitable for park purposes. This statute plainly established a 'closed class' but was reasonably related to the general object of the act -- the development of public beaches -- which benefitted all the people of the state. County of Cameron v. Wilson, 160 Tex. 25, 326 S.W.2d 162 (1959).

In Robinson v. Hill, 507 S.W.2d 521 (Tex. 1974), the court held that a statute providing for the licensing of bail bondsmen in counties having a population of 150,000 or more does not violate the prohibition against general and special laws. In Robinson the court stated:

Assuming as we do at this point that the statute by its terms does not apply throughout the State, the primary and ultimate test of whether the law is general or special is whether there is a reasonable basis for the classification it makes and whether the law operates equally on all within the class. [Citations omitted.] The Legislature in this instance may well have concluded that bail bondsmen in the more populous counties should be regulated and required to secure their obligations because of the high incidence of crime and the difficulties involved in enforcing bond forfeitures and determining the net worth of persons engaged in the business of writing bonds, but that the same safeguards and procedures were not necessary and would be unduly burdensome in more sparsely populated areas. There is a reasonable basis for the classification made by the law, and the classification is broad enough to include a substantial class. The fact that counties just on either side of the population line are similarly situated, or that there are excluded counties constituting part of the same metropolitan area as included counties, does not make the classification unreasonable. Any classification on the basis of population is subject to this complaint, and that circumstance alone is not a sufficient basis for holding the statutory classification unconstitutional. The Legislature has rather broad power to make classifications for legislative purposes, and there is

> nothing here to suggest that the line drawn is arbitrary or capricious or a mere device used for the purpose of giving a local law the appearance of a general law. See Miller v. El Paso County, 136 Tex. 370, 150 S.W.2d 1000.

In cases in which the constitutionality of a statute is challenged, the courts consistently grant the presumption of validity to a statute and presume that the legislature has not acted unreasonably. Robinson v. Hill, supra; Smith v. Davis, 426 S.W.2d 827 (Tex. 1968).

House Bill 1162, Acts 1981, 67th Leg., ch. 824, at 3134 (eff. Aug. 31, 1981), amended section 144 to exempt larger cities from having to share fine money from speeding violations on interstate highways with the state. The bill analysis to House Bill 1162 stated that the purpose of subsection (b) of section 144 "was to discourage the use of radar as a local revenue device by certain small cities in which most of the interstate travel is not local traffic." It was further noted that in larger cities "the interstate freeway system plays an important part of the city's internal transportation system, and much of it is local traffic."

While subsection (b), as amended by the 71st Legislature, covers all violations of highway laws on interstate highways rather than only speeding violations, we perceive no less opportunity for abuse by municipalities that may be prompted to issue traffic citations solely for the purpose of raising revenue.

It is undoubtedly true that many small municipalities that collect traffic fines from violations on interstate highways do not abuse the system to raise revenue to support their budgets. As noted in Robinson any classification based on population is subject to this complaint. The legislature may well have concluded that the chance for abuse in charging traffic violations on interstate highways was greater in small municipalities that utilize the money generated from traffic fines from nonresidents as a substantial portion of their revenue. There appears to be a reasonable basis for the classification made by section 144. The classification is broad enough to cover a substantial class. We believe that a court would find that the line drawn is not a device used for the purpose of giving a local law the appearance of general law, but that the legislation concerns a matter of statewide effect and interest and

therefore that section 144 is not violative of article III, section 56, of the Texas Constitution.[2]

## S U M M A R Y

The provisions of section 144(b) of article 6701d, V.T.C.S., prior to its amendment by the 71st Legislature remain in effect until a fiscal year begins for the municipality following September 1, 1989. The basis for calculating the allocation of traffic fine money where there has not been a full fiscal year prior to September 1, 1989, is based on the fine in each speeding case pursuant to the allocation formula contained in subsection (b) prior to its amendment until the expiration of a full fiscal year. For cities that have changed their fiscal year less than a year prior to the effective date of House Bill 243, the allocation should be based on the last full fiscal year prior to September 1, 1989. For cities incorporated after September 1, 1989, section 144(b), as amended by the 71st Legislature, becomes effective at the expiration of the fiscal year following incorporation. Until such time the allocation is based on subsection (b) prior to amendment. In instances where the municipality has only recently established a budget and a municipal court, although incorporated for a full year in which there was no revenue, the allocation is to be made under subsection (b) prior to its amendment until the expiration of the fiscal year following establishment of the budget. Section 144(b) of article 6701d, V.T.C.S., is not a local or special law as prohibited by

---

2. Without passing on its relevance to this question, we note that municipalities with a population of less than 5,000 are chartered by general law pursuant to article XI, section 4, of the Texas Constitution and possess only such powers as those given it by the legislature and those which may be necessarily implied therefrom. See Ex parte Ernest, 136 S.W.2d 595 (Tex. Crim. App. 1940).

article III, section 56, of the Texas Constitution.

Very truly yours,

JIM MATTOX
Attorney General of Texas

MARY KELLER
First Assistant Attorney General

LOU MCCREARY
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RENEA HICKS
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Tom G. Davis
Assistant Attorney General