## Vitacolonna et al. v. City of Philadelphia

*Daniel Sherman, Paul Weinblatt, I. Irving Tubis* and *Romain C. Hassrick,* for plaintiffs.

*Abraham L. Freedman,* City Solicitor; *Herman L. Mash* and *Karl I. Schofield,* Assistant City Solicitors, for defendants.

MacNeille, P. J., June 17, 1954.—Plaintiffs in these companion equity actions have filed lengthy complaints setting forth various alleged bases for the invalidity of the defendant city's proposed universal water metering program. The city filed preliminary objections to each of the complaints, which objections we refused, deeming it more appropriate that the parties be given a full opportunity to develop the factual background preparatory to consideration of some of the constitutional questions involved. The matter came on for trial before two judges sitting as a court in equity on January 18, 19 and 22, 1954. The last set of requests for findings of fact and conclusions of law were filed on April 9, 1954, and the last brief was filed by the city in support of its requests on May 19, 1954.

The complaint pertinently sets forth that the city owns and operates a water works which supplies water to about 320,000 metered and about 180,000 unmetered water users; that on December 9, 1952, city council appropriated $1,200,000 to achieve universal

metering and that on February 14, 1953, the water commissioner filed Regulation No. 4 setting forth a program designed to achieve universal water metering. The plaintiffs purport to represent metered users, unmetered users and registered plumbers and the complaint is drafted in three separate counts, one for each group. The plaintiff metered users contend that the regulation and contemplated program of the city is unconstitutional and void as being in conflict with the due process and equal protection of the laws clauses of the United States and Pennsylvania Constitutions; that the regulation is in conflict with article IX, section 7 of the Pennsylvania Constitution which prohibits the General Assembly from authorizing any city "to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual"; that the regulation is in conflict with section 18 of the Act of April 21, 1949, P. L. 665, 53 PS §3421.18, which prohibits any city from engaging in any proprietary or private business except as authorized by the General Assembly; that there are various aspects of discrimination as against persons who have already installed meters and paid for them. The plaintiff unmetered users additionally allege that the defendant water commissioner has so interpreted his own regulation as to require all unmetered users to purchase their water meters only from the city and that the city set such meters, and have set forth various alleged bases of invalidity of such action. The plaintiff master-plumber contends that the water commissioner's threatened actions impinge upon his freedom to contract and freedom to engage in a lawful business enterprise and is in conflict with the Act of June 7, 1911, P. L. 680, as amended by the Act of May 7, 1931, P. L. 101, July 2, 1935, P. L. 561, and May 15, 1947, P. L. 264, 53 PS §4071 et seq.

From our consideration of the pleadings and the evidence adduced at the hearing held herein, we make the following

*Findings of Fact*

1. The Water Commissioner of the City of Philadelphia on February 14, 1953, filed Water Rent Regulation No. 4, to be effective January 1, 1953, providing for universal metering of water in the City of Philadelphia; a copy of said regulation is attached to the plaintiffs' complaint as Exhibit "A" and is also attached to this adjudication as Appendix "A".

2. Paragraph 1 of said regulation provided that all water supplied to consumers shall be metered except in extraordinary circumstances and that consumers are required to furnish and install at their own cost and expense an approved meter or meters for such purposes.

3. Paragraph 2 of said regulation provides that where meters have been previously installed such installation shall constitute a compliance with the requirement of paragraph 1 of the regulation.

4. Paragraph 3 of said regulation provides that the city will maintain, repair and, when necessary, replace all meters without additional cost to the consumer.

5. Paragraph 4 of said regulation makes certain provisions as to the location of the meter.

6. Paragraph 5 of said regulation provides for a notice to be sent to unmetered consumers to install a meter within a fixed time and that the consumer may cause a meter to be installed at his own expense within such time by a private registered plumber. This portion of the said regulation is to be superseded by Regulation No. 5 which provides that the consumer may elect to have the necessary preliminary work performed by a registered plumber of his choice but that

the actual setting of the meter is to be performed by the water department.

The preliminary work referred to in said Regulation No. 5 consists of cutting the supply pipe, replacing worn out pipe, installing a valve if necessary, installing a device known as a yoke or horn and inserting a filler or spacer pipe where the meter will later be set by the department of water. Paragraph 5 of said Regulation No. 4 further provides that if the consumer does not install a meter as required, or have the preliminary work done as provided in Regulation No. 5, within the time fixed, the water department may proceed to make such installation at the expense of the consumer with further provision for collection, liens and penalties and the right to "shut off the supply of water to any consumer who has failed to install a meter within the time fixed . . . or has refused to permit [installation of] a meter. . . ."

7. Paragraph 6 of said Regulation No. 4 provides for the installation of curb stops or shutoff valves as part of the water installation at the consumer's expense.

8. Paragraph 7 of said Regulation No. 4 provides that defective piping in the consumers' premises which affects or is affected by the installation of a meter shall be repaired or replaced by the consumer at his own expense.

9. Paragraph 8 of said Regulation No. 4 provides for billing the cost of such meter installation and permits the owner of such premises, at his option, to make payment in three equal yearly installments, with provision for interest at 6 per cent on any unpaid balances.

10. Paragraph 9 of said Regulation No. 4 covers certain provisions with regard to supplemental or special meters.

11. The city will take the following steps in putting into effect the program for universal metering:

(a) Each owner of an unmetered property will receive a preliminary notice describing the city's program.

(b) Each unmetered property will be inspected by an inspector attached to the water department and a report of existing conditions will be filed by him with the department.

(c) A specific notice together with a form will then be.sent to the property owner upon which form the owner will be requested to indicate whether the preliminary work is to be done by his own plumber or whether he prefers that the city have the work done.

(d) Those property owners who indicate a desire that the city have the preliminary work done will be classified into groups of 5,000 or 10,000 and after due advertisement and competitive bidding contracts will be let to qualified contractors employing supervising registered plumbers for the performance of the preliminary work.

12. All meters will, in due course, be set by employes of the department of water specifically trained in the job of setting and removing meters.

13. Department of water employes have removed, repaired and set water meters in the city of Philadelphia for the past twenty years, averaging 20,000 to 25,000 resettings per year for the past seven or eight years.

14. The average length of service of the employes referred to in finding of fact number 13 is twelve years.

15. In the operation of both privately owned and municipally owned water works it is standard procedure for meters to be placed in position by water department employes and for such meters to be removed, repaired and replaced by department employes.

As an aspect of such standard proceedure the work preliminary to such meter installation, including the making of fittings and necessary connections, is done by a plumber, but not the installation of the meter itself.

16. There are presently approximately 370,000 metered properties and approximately 180,000 unmetered properties in the City of Philadelphia.

17. Approximately 95% of the 180,000 properties to be metered will require the ⅝″ domestic size meter, which is the smallest meter size.

18. By grouping of installations and competitive bidding the city will have meters installed at an estimated standard installation cost (including the profit to the contractor) of approximately $35.00. The cost of the same installation, exclusive of a yoke or horn, by an individual plumber will be approximately $40.00.

19. The use of a yoke or horn is a permissible and useful accessory to the installation of a water meter because:

(a) it establishes a fixed space for the placing of the meter.

(b) it establishes a continuous electrical ground avoiding severe electrical shocks to persons placing or removing the meter.

(c) it maintains the meter in continuous alignment avoiding undue stresses or strains on the mechanism of the meter.

(d) it is a stronger installation, and minimizes the strain on the water piping.

20. The practice of placing a space pipe preliminarily to the setting of the meter is desirable in that a thorough flushing of particles of rust and dirt in the line thus takes place avoiding a clogging of the meter.

21. Maintenance of meters by the city is reasonable and desirable because:

(a) it greatly reduces interruptions in registering the water consumed which would otherwise occur when a meter is removed for repairs and not restored to service until repairs have been completed.

(b) regular maintenance and inspection will greatly reduce the number of slow meters, i.e., meters registering less than the amount of water actually consumed.

(c) it will enable standardization of meters resulting in a reduction of inventory and stock parts for meters.

22. The installation of meters by the city is necessary and desirable because:

(a) the city can maintain proper records of the installation date, location and serial number directly without having to rely upon the report of a plumber as was formerly the case.

(b) the meter can be inspected at the same time that it is set.

(c) the meter can be sealed to prevent tampering or reversing at the time it is set.

(d) the city can purchase meters in large quantities resulting in a considerable saving to the city and to the water user; the present price of a 5/8" meter as sold to a plumber is $24.07, whereas the price of such meter when bought by the city in lots of 10,000 is $19.94. Comparable savings will be effected as to larger size meters.

23. The program of maintaining and repairing meters without specific charge to the individual taxpayer will cost the city of Philadelphia approximately $600,000 per year, which cost will be recouped by the city in the determination of its water rates and particularly in the determination of minimum annual charges.

24. In the operation of both privately owned and municipally owned water works it is usual and cus-

tomary for the water utility to bear the expense of repairs and maintenance of its water meters.

25. The complaints have failed to establish by satisfactory and credible evidence that the setting of water meters by the City of Philadelphia will cause any threat of contamination to the city's water supply, explosions or cross-connections.

26. In accordance with standard practice the water department lays, repairs and maintains water mains in the public streets. The danger of contamination to the water in such operations is much more acute than in the setting of meters.

27. Universal water metering is efficient, fair, desirable and economical in the operation of the water works of a large municipality.

28. As a matter of better and generally more efficient operation of both privately and publicly owned water works it is usual practice for the water utility to own and have complete dominion, control and jurisdiction over its water meters.

29. Under the city's proposed universal metering program whereby meters are to be purchased by and installed by the city such meters will be and remain the property of the city of Philadelphia and be a part of the city's water supply facilities. The fact that the cost of such meters and the installation thereof is to be directly passed on to the consumer does not constitute such meters the personal property of the consumer.

30. In the absence of evidence of intention to the contrary the annexation of a water meter to the city's water supply facilities constitutes a transfer of possession, dominion, control and title to such water meter by the consumer to the City of Philadelphia.

### Discussion

The plaintiffs in these companion equity actions seek to restrain the defendant city and its officials from

carrying into effect the provisions of Water Rent Regulation No. 4 issued by the Department of Water pursuant to the authority conferred by sections 5-800 and 5-801 of the Philadelphia Home Rule Charter adopted pursuant to statutory authorization. These sections provide as follows:

"Section 5-800. Functions. The Water Department shall have the power and its duty shall be to perform the following functions:

"(a) Water. It shall operate the City's water supply system, and shall either itself, or by contract, construct, maintain, repair and improve City water supply facilities, including fire and drinking hydrants and water meters. It shall make investigations and prepare plans and estimates looking towards the acquisition by the City of new and better sources of water supply, and shall, with the approval of the Managing Director, make its recommendations to the Mayor for transmission to the Council. It shall also investigate and adopt methods for improving the quality of the water supply. . . .

"Section 5-801. Rates and Charges. In accordance with such standards as the council may from time to time ordain, the Water Department shall fix and regulate rates and charges for supplying water, including charges to be made in connection with water meters, and for supplying. sewage disposal services. The standards pursuant to which rates and charges shall be fixed by the Department shall be such as to yield to the City at least an amount equal to operating expenses and interest and sinking fund charges on any debt incurred or about to be incurred for water supply, sewage and sewage disposal purposes. In computing operating expenses, there shall be included proportionate charges for all services performed for the Depart-

ment by all officers, departments, boards or commissions of the City."

That Regulation 4 is properly issued pursuant to charter authority, and is encompassed by sections 5-800 and 5-801, is not and could not be successfully challenged. The plaintiffs principally contend, however, that the city's proposed universal metering program is invalid insofar as it requires that all meters must be furnished and set by the city. The plaintiffs contend (1) that this aspect of the program is an infringement upon the right of the taxpayers owning unmetered premises to contract for the purchase of meters from and setting of meters with whomsoever they choose to engage; that such requirement is in conflict with article I, sec. 1 of the Pennsylvania Constitution and the fourteenth amendment to the United States Constitution. The plaintiffs additionally contend (2) that the city's plan for "pooling" meters and interchanging them is a threat of deprivation of property without due process of law; (3) that the proposed requirement that all meters be set by city employes who are not registered master plumbers is prohibited by the Act of May 7, 1931, P. L. 101, as amended, 53 PS §4071; (4) that the proposed deferred payment plan for meter installation is an extension of the city's credit to private individuals in violation of the article IX, sec. 7 of the Pennsylvania Constitution; (5) that the city is engaging in a proprietary or private business unauthorized by the General Assembly, in violation of the Home Rule Act of April 21, 1949, P. L. 665, 53 PS §3421.18. We shall consider these contentions seriatim.

The plaintiffs' first contention is to the effect that the universal metering program is invalid insofar as it requires that the meters are to be furnished and set by the city. The Act of May 12, 1925, P. L. 612, 53

PS §§4191-4194,[1] however, is a legislative enactment which clearly empowers the City of Philadelphia to install water meters at the expense of the property owner and requires the property owner to permit such installation. This statute provides as follows:

"Section 1. Be it enacted, &c, That from and after

---

[1] See also Ordinances and City Solicitor's opinions of the City of Philadelphia, Ordinance of December 2, 1916, page 499, et seq., secs. 2, 3, 4 and 5 of which provide as follows:

Section 2. The Director of the Department of Public Works is hereby empowered and authorized to furnish and install meters in all premises where an undue or wasteful use of water is permitted, and to transfer from appliance rating to meter rating all said premises.

Section 3. All meters furnished and installed by the Director of the Department of Public Works by reason of section 2, or any other section of this ordinance, shall be so furnished and installed at the expense of the owner or owners of the premises affected and the cost thereof shall be included in and collected as hereinafter provided for meter accounts.

Provided, That the meter or meters placed on any premises shall not be of a larger size than the service pipe attached to the ferrule supplying said premises, which size is regulated by ordinance of councils approved June 1, 1871.

Provided further, Whenever any fixture in any premises is required to be metered, the meter shall be placed upon the service pipe supplying said premises, and no premises so metered shall be charged by fixture rate.

Section 4. All meters shall be under the control of the Chief of the Bureau of Water. The consumer shall be held responsible for the safe-keeping of the meter, or meters, on his premises, and all repairs shall be made at the consumer's cost, whether such repairs are made necessary by ordinary wear and tear, freezing, hot water, fire, accident or other causes. Bills for such repairs shall be collected as hereinafter provided for meter accounts.

Section 5. No meter shall be set, reset or removed without a written order from the Bureau of Water. If a meter is set, reset, or removed without such order, there shall be charges to cover the cost of inspection, test or supervision, a sum in the amount of the annual minimum charge for the connection, which sum shall be collected as hereinafter provided for meter accounts.

the passage of this act the municipal authorities of every city of the first class within this Commonwealth which now owns and operates or may hereafter acquire or construct and operate its own water works shall have the power to require the owner or owners of every separate property supplied from such water works to install or permit the installation of a water meter or meters upon and for such property.

"Section 2. The municipal authorities of any city of the first class aforesaid may require the owner of every property upon and for which a water-meter is installed to pay the reasonable cost of and charge for installing such meter at such times and in such amounts as the said authorities shall prescribe. Such cost and charge shall be a lien upon the property upon and for which the water-meter shall have been installed.

"Section 3. Liens for cost of and charges for installing water-meters shall have the same priority and shall be enforceable in the same manner as municipal claims are now entitled to have and to be enforced by law.

"Section 4. All acts and parts of acts inconsistent herewith are hereby repealed.

"Section 5. If any part of this act shall be declared to be invalid or unconstitutional the remaining parts hereof shall be and remain the valid act of the Legislature."

This act, referable by its terms to Philadelphia as a city of the first class, authorizes the city "to require the owner . . . to install" a meter or to "permit installation" of a meter. We consider the city to be comprehended within the phrase "permit installation" so that it may install such meter itself. The election is the city's as to whether the property owner or the city shall so install the meter. Although the plaintiffs have not directly challenged the validity of this statute, their contentions as to due process and freedom of contract indirectly challenge its constitutionality.

The plaintiffs contend that the requirement "that consumers buy water meters only from the city and in requiring that only the city install said meters, impairs the freedom of the consumer to contract with whomever he please" as guaranteed by the fourteenth amendment to the Federal Constitution [citing Allgeyer v. Louisiana, 165 U. S. 578 (1879)]; that restrictions by the state must be reasonable and "for the purpose of attaining a legitimate governmental function or end" [citing Advance-Rumely Thresher Co., Inc., v. Jackson, 287 U. S. 283 (1932)]. Initially we may note that we cannot accept the plaintiffs' paraphrasing of the nature of the city's program. The city is not requiring the consumer to buy his meter only from the city, on the contrary it is the city which proposes to buy the meters and to install them and by statutory authority it is authorized to pass on the cost of such installation to the consumer. Simply because the consumer bears the cost of the meter does not confer upon him any right to select his supplier, nor, indeed, does it necessarily constitute him the "owner" of the meter in the sense of personal property. The city, in its excellent briefs filed in this matter, approaches the reality that the meter does not really "belong" to the consumer, but does not fully accept the challenge in terms of technical title to the meter.[2] Although we

---

[2] The following appears in the city's brief:

"Plaintiffs apparently labor under a misapprehension. They believe that because the consumer pays the cost of the meter, he has a right to select the person from whom he will purchase it and that he obtains absolute ownership of it. Perhaps the misapprehension has been formed in part because of the city's past custom in permitting the selection of meters, as mentioned above and because the city removed broken meters and returned the identical meters when they had been repaired. As was demonstrated during the hearing, these procedures were neither efficient, nor desirable, nor in accordance with modern utility practice. These

consider the city position to be correct, and though it may not be necessary to go so far as we do, we are of the opinion that less violence is done to the principles of personal property by recognizing that the consumer impliedly surrenders dominion, possession and control of the meter to the supplier of water; that the meter, though personal property when unconnected, becomes a part of the city's water supply system when it is annexed thereto.

The plaintiffs have assumed that the property owner owns his water meter because he paid for its cost and installation, citing Foster v. The Trustees of The Philadelphia Gas Works and the City of Philadelphia, 12 Phila. 511 (1878). However, we do not regard that case as authority for such proposition and its language is to the opposite effect. At page 512, the following appears:

"The meter is an instrument of delicate mechanical construction, easily rendered useless or incorrect in the performance of its functions by being displaced or improperly interfered with. The wet meter particularly will not act properly, except when standing on a dead level. *Now the meters belong to the trustees, and are under the sole supervision and control of their inspec-*

---

practices, moreover, furnish no confirmation of plaintiffs' position of an absolute right to contract with respect to meters for measuring city water.

"The fact that the water user pays for the meter initially is without significance. If the consumer were not charged directly for his meter, he would pay for it indirectly through an increased rate. In this event, plaintiffs would not claim that there is a right to select the company from whom the consumer wishes to purchase his meter. The mere fact that the city has decided that it does not want all of the consumers to pay for the meters through increased water rates, but rather prefers that those consumers who are being furnished with meters shall pay for them, does not create a freedom of choice of the seller in the consumers. It should not matter whether the charge for the meter is a direct and separate charge or an indirect rate charge."

*tors and officers.* They are the only means which exist for registering the amount of gas consumed. It must be plain to any one that if the governor is attached directly to the outlet of the meter the latter will be liable to serious disturbance and injury as often as persons may have occasion to remove or meddle with the former; for it must be remembered that the governor is not, like the meter, the property of the trustees, but belongs to the owner, who will claim to exercise the same control over it which he exercises over other fixtures or property belonging to him." (Italics supplied.)

Section 5-800 of the charter, insofar as it provides that the water department "shall either *itself*, or by contract, construct, maintain, repair and improve City Water supply facilities, including . . . water meters" (italics supplied) empowers the department to supply the meter and maintain it as part of the water supply facilities. Section 5-801, providing that the department "shall fix . . . charges for supplying water, including charges to be made in connection with water meters . . ." empowers the city to pass along to the consumer the cost of so supplying and installing meters.

The legislative body not only has the right and power to govern the type of meter to be installed, but it may further, through the administrative branch, conclude that such meters should be installed by the city itself as the supplier of water. There is ample evidence to support a legislative conclusion that it is necessary that water taken from the city's supply be measured by meters set and maintained by the city; that in effectively performing its function the make, type, design and other characteristics of the meter be determined by the city. The plaintiffs persist in referring to the city's proposed action as "an absolute prohibition against the doing of certain things by the consumer

and plumber" whereas we regard it as more appropriate to state that the city is affirmatively performing a function it is authorized to do without any obligation to perform such function in a manner more acceptable to or more profitable to the plaintiffs. It is a sufficient basis for the city's choice of mode of procedure that the planned program is designed to inure to the benefit of the overwhelming mass of taxpayers and consumers. The city's program does not "prohibit people from dealing with whomever they please", but is an exercise of the city's right to perform its functions and to deal with suppliers of its choice. The city is not "regulating", it is "doing".

The plaintiffs refer to Frank Supply Corporation v. Quilty, 49 N. Y. S. 2d 943 (1944), and Franke v. Paducah Water Supply Company, 88 Ky. 467 (1889), in support of their petition that the city's program is an invalid infringement on their freedom to contract. Both of these cases are clearly distinguishable on the basis that they involved discriminatory regulation of private suppliers, but did not involve the city's right to make contractual engagements. In the Quilty case, the New York City Water Department promulgated a regulation prohibiting private meter repair firms from accepting meters for repair from anyone except the owner or a plumber holding a repair permit; other plumbers and plumbing supply houses were excluded. The court sustained the contention of the plaintiff supplier that it had a right to receive meters from its plumber customers and deliver them for repair to authorized repair companies. The court in that case properly pointed out that the prohibition contained in the regulation was not reasonably related to the purpose of securing proper meter repair. In the instant case if there is to be discrimination it results from the fact that the city cannot hire every plumber in the City of Philadelphia or purchase meters from every

supplier; the city must choose its suppliers and it is sufficient that they are to be fairly chosen via the process of competitive bidding.

In the Paducah Water Supply Company case, the defendant private water company sought to prescribe conditions and qualifications as to which persons could connect pipes from private properties to its mains, requiring that such persons be licensed by the company. The court held that the company, having undertaken the performance of a public duty, had devoted its property, including its mains, to public use; that the company had no right to prohibit connection with its pipes or to dictate to the owner who should make such connection, if such person was otherwise qualified to do the work. In the instant case we have already observed sufficient basis for the city's insistence that the meter purchases and installation be made by its employes, advantages of efficiency and economy. And further, in the instant case, as pointed out above, the city is not regulating its suppliers but is merely selecting its own suppliers on the basis of competitive bids.

From the view we have taken of this matter it is quite clear that the so-called interference with freedom of the consumer to contract with any supplier he may choose falls in the first instance since it is the city which is doing the contracting for portions of its own water supply system. The right of a municipality to require the installation of water meters at the cost and expense of the consumer has not been heretofore questioned in this Commonwealth and such right has been sustained in sister jurisdictions.

In Swanberg v. City of New York, 123 App. Div. 774, it was held that the charter of the City of New York authorizing commissioners of water supply to place meters on the premises of consumers at the expense of such consumers was not unconstitutional as

a taking of private property without due process of law. The Court stated (at page 775) :

"While it is true that the City of New York is delivering water to private individuals acts in a sense as a private corporation, yet the duty and obligation of the municipality to afford fire protection and to safeguard the public health through a pure and wholesome supply of water, makes the maintenance of the water system more of the nature of a duty owing by a public or municipal corporation, and to say that it is not within the province of the State Legislature in authorizing the City of New York to construct and maintain a water plant, to provide for placing meters upon the premises of those who are to use the water, on the theory that this is a taking of the property of the individual without due process of law, is carrying constitutional limitations to the limit of absurdity." See also Anderson v. Village of Berwyn, 135 Ill. App. 8; Shaw Stocking Co. v. Lowell, 199 Mass. 118, 85 N. E. 90; Cooper v. City of Goodland, 80 Kans. 121, 102 Pac. 244.

The plaintiffs' second contention is that the city's plan for "pooling" meters and interchanging them is a threat of deprivation of property without due process of law; that the city by returning a different meter following repair will thereby deprive the "owner" of his personal property; that the intentional intermingling of "personal property" without the consent of the owner is invalid [citing Lauman v. Lebanon Valley Railroad, 30 Pa. 42 (1858)]. We have conjectured at some length as to the tender solicitude and fond attachment shown in this proceeding for the consumers' meter qua meter. We had not heretofore had notice of any real estate transaction wherein a property owner demonstrated such attachment by reserving his right to remove his meter to new quarters. A consideration of the record is sufficiently convincing

that we are not confronted with any fondness for meters, nor, indeed, is this suit brought on behalf of the taxpayers as such, but rather it constitutes an effort by one portion of the plumbing trade to forestall a program in which they conceive that they will not share.

We have heretofore sufficiently indicated that we regard the water meter as an integral part of the city's water supply facilities; that the meter belongs to the city, not the consumer. So regarded, there can be no deprivation of property. In any event we are of the opinion that as a condition for receiving his water supply each consumer impliedly consents to proper meter maintenance by the city. The plaintiffs do not deny that the metering of water is equitable and desirable and that it prevents water waste. In order to operate its system efficiently and to avoid discrimination which results from meters in disrepair it is essential that the city maintain control of its meters and keep them in proper repair by the most efficient means. In the Ordinance of December 2, 1916, such necessity was clearly recognized in sections 4 and 5 quoted in full in our footnote 1 above.

The city in its brief states the following:

"In the past it was the City's practice to repair a partly broken meter and to return the same meter to the property from which it was removed. This procedure was inefficient, since the repair of a meter always resulted in a period of time when water was being used on a property which was not being measured. Frequently new parts were required in the repair of meters and to the extent that new parts were used, there was an interference with the owner's right to get back the identical water meter, according to plaintiffs' theory. In some instances, the entire mechanism had to be replaced and only the case was returned. In such instances it could hardly be said that

the same meter was being returned to the consumer. Futhermore, the consumer was charged directly with the cost of repair, although he was not given any say with respect to choice of the supplier of the replacement parts or the extent of the replacement. Under the proposed program the consumer is entitled to and will receive the services of a properly functioning meter at all times. There will be no 'interference' with meters which are properly functioning. Only when a meter is out of repair will the city replace it. The consumer will then receive in exchange for a useless meter, a workable meter and he will be relieved of the direct cost of repair and installation. Nothing will have been taken from the consumer for which compensation could be claimed. The consumer will receive a meter in proper working order which has a definite value for something which has little or no value."

The plaintiffs have also argued that the proposed plan is in some sense discriminatory. We consider it to be quite clear that Regulation 4 is quite reasonable and fair and in no manner discriminatory. The fact that persons who have already installed meters on their premises will not have the advantage of securing meters on the same terms now offered or the fact that meters may have heretofore been replaced at a charge to the consumer does not bind the city to continue such procedure and methods forever: See Central Iron and Steel Co. v. Harrisburg, 271 Pa. 340, 344 (1921). The program is fair to persons similarly situated and all consumers are hereafter to be treated identically insofar as meter replacement is concerned. The attempted distinction between consumers who will receive replacement of larger meters and consumers who will receive smaller meters overlooks the fact that such charges are to be reflected in the water rates.

The appellate courts of this Commonwealth have consistently rejected the allegations of theoretical in-

equities or petty difference arising out of change in the method of exercise of lawful authority. In Rankin v. Chester Municipal Authority, 165 Pa. Superior Ct. 438, 450 (1949), the court refused to consider differences which fell short of manifest, flagrant and undue preference. The court stated:

"The appellant also complains that the present water users are contributing more than their fair share of the cost of the new water supply and that the higher rate schedules are in effect an imposition of taxes pursuant to an improper and unlawful delegation of power to the authority. While to a limited extent the present water users may temporarily be called upon to accept higher rates, the situation is of their own choice, in their own interest, and as a result of their insistent demands for a better water supply. The contributions of the present users in excess of the payments by future users are problematical, but in any event they will be quite small, reasonable and proportionate. Moreover, those who use the water facilities over a period of forty years (spread of construction bond maturities) will of course contribute their fair and proportionate share of the improvement costs. In securing benefits and improvements of this and like nature, some discrimination and some preferences may be made; they cannot be measured with mathematical exactness. If there is no manifest injustice, unreasonable discrimination or undue preference—and none has been here shown—the courts will not interfere."

The plaintiffs' third objection is that the proposed requirement that all meters are hereafter to be set by city employes who are not registered master plumbers is prohibited by the Act of June 7, 1911, P. L. 680, as amended by the Acts of July 2, 1915, P. L. 561, May 7, 1931, P. L. 101, July 2, 1935, P. L. 561, May 15, 1947, P. L. 264, 53 PS §4071, *et seq*. The evidence adduced at the hearings showed that under

the city's proposed program the work preliminary to a meter installation is to be performed by or under the direction of registered master plumbers. This involves a cutting of the supply pipe and the installation of a spacer and temporary filler pipe, which may be done by a plumber chosen by the property owner if he so desires. The meter will then be set by the department's employes. The "setting" operation involves a shutting off of the water supply, removal of the spacer and temporary filler pipe and fitting or setting the meter in place and turning the water on. The water department, by setting the meter, will be able to install, inspect, record the reading and serial number of the meter and approve the installation all at one time. The meters are to be set by water department employes, specifically trained in the job of setting and removing meters, who have an average length of service at such work of approximately 12 years. It is particularly pertinent to note that for at least the last twenty years department of water employes have removed, repaired and set meters in this city, averaging 20,000 to 25,000 resettings per year for the last seven or eight years. We have set forth in our findings of fact on the basis of the credible evidence that the seting of meters by water department employes does not present any threat of contamination to the city's water supply or of explosions of cross-connections.

The plumbing code (Act of 1911, as amended, *supra*, 53 PS §4071) provides, *inter alia*, as follows:

". . . it shall be unlawful for any person or persons to carry on the business or work at the trade of plumbing, defined as drainage, water piping, or the construction, alteration, and repairing any drainage, cesspools, trap, waste vent, or water piping, and fixtures attached thereto, directly or indirectly, connected to the city service water supply, or any connection or connections in relation thereto, except gas or

electric water heaters in cities of the first class, having a system of sewage and water supply, of this Commonwealth, until a master plumber's license and certificate of registration to engage in or work at said business shall have been granted said persons by the Department of Health of such cities: . . .

"Provided, That the term plumbing shall not be construed to include the laying of sewers and water pipes (including the laterals) by said cities, either directly or by its duly authorized contractors or agents, or constructed under the supervision of said cities, or under the supervision of a registered professional engineer. . . ."

From our consideration of all of the evidence we are of the opinion that the setting of meters by city employes is not the performance of a plumbing function within the meaning of the plumbing code; that, in any event, the city in the setting of meters is exempted from the operation of the plumbing code. It is unnecessary to review in detail the function of setting a meter or how such function is performed in other water utility operations; we are satisfied that the setting of a meter does not require the expert services of a plumber. The plumbing code provides that "the term plumbing shall not be construed to include the laying of sewers and water pipes (including the laterals) by said cities, either directly or by its duly authorized contractors or agents . . .". A lateral is the pipe which is run from the city's water mains to the property of the person receiving water service and the water meter is inserted in or attached to the terminus of such lateral and in effect becomes a part of the end of the lateral. When we consider that the city has always been permitted to lay water pipes and sewer pipes in the beds of streets through its own employes and under the supervision of its engineers without the employment of registered plumbers, which work is

more intricate and more closely related to the health and safety of the public than the setting of water meters, it would be illogical to require the latter operation only to be done by registered plumbers. We are buttressed in our conclusions by unchallenged practice in the past whereby the city has had its meters reset, repaired and replaced by other than registered plumbers.

The plaintiffs contend that the proposed deferred payment plan for meter installation is an improper extension of the city's credit to private individuals in violation of article IX, sec. 7, of the Pennsylvania Constitution, which provides as follows:

"The General Assembly shall not authorize any county, city, borough, township or incorporated district to become a stockholder in any company, association or corporation, or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual."

This provision is historically and by its terms inappropriate to the instant case. The city is not lending its credit to the consumer, but rather is at most extending credit to the consumer in a transaction between the consumer and the city. This constitutional provision was designed, inter alia, to prevent the city from becoming indebted as a guarantor or endorser for the benefit of any individual, it does not prohibit reasonable collection arrangements with the city's debtors. In Downing et al. v. Erie School District et al., 297 Pa. 474, 479-480 (1929), Mr. Justice Sadler adverted to the reason for and scope of this section as follows:

"To remedy the evils incident to subscriptions by municipalities to stock of railroads and like enterprises, the constitutional prohibition against purchases of securities, and pledges of credit, was introduced first into the Constitution of 1857, and repeated in that of 1874. The history of this limitation, as well as the purpose intended to be effected thereby, has been the

subject of frequent discussion in our cases, and need not be again elaborated on: Com. v. Walton, 182 Pa. 373; Wheeler v. Phila., 77 Pa. 338; Speer v. School Directors, supra. The thought was not to prevent the municipal corporation from entering into engagements to carry out a proper governmental purpose, though the incurring of indebtedness results: Sambor v. Hadley, 291 Pa. 395; Com. v. Barker, 211 Pa. 610. So it may invest in property which it leases to another (Wheeler v. Phila., supra), or make advances for the cost of improvements: Brooke v. Phila., 162 Pa. 123; City Club of Phila. v. Pub. Ser. Com., 92 Pa. Superior Ct. 219."

Insofar as the plaintiffs contend that the city is offering to pay contract plumbers on behalf of the consumer if the consumer so elects, they again improperly shift the emphasis of the city's program. The pertinent statutes and water rent regulation no. 4 provide that the city shall itself do the preliminary plumbing work and install a meter if the consumer shall fail to do so. A method of reimbursement as against the consumer is provided for. This function is not transmitted into an extension of credit simply because the consumer advises the city in advance that he will not perform the necessary preliminary work himself.

The plaintiffs finally contend that the city is engaging in a proprietary or private business which is unauthorized by the General Assembly and is therefore in violation of the Home Rule Act of April 21, 1949, P. L. 665, 53 PS §3421.18, which provides, inter alia, as follows:

"No city shall exercise any power or authority beyond the city limits except such as are conferred by an act of the General Assembly, and no city shall engage in any proprietary or private business except as authorized by the General Assembly."

This contention is without merit. The Act of May 12, 1925, and section 5-800 of the Home Rule Charter quite

clearly authorize the city to install water meters in the properties of consumers. Again the plaintiffs err in conceiving that the city is bound by its past practice. The city is given the authority to allow the consumer to install his own meter or to install such meters itself. Upon consideration of the universal metering program and the most efficient and expeditious method for its achievement, the city, by its duly constituted authorities, has determined that the metering should be performed by it directly. The fact that "prior to the city's present program, the business of buying, selling and installing water meters was a subject of legitimate private enterprise" as between the consumer and his chosen supplier does not bar the city from exercising its power to install the meters itself. The power granted by the Legislature did not become any the less a power nor did it become less authorized as the engagement in a proprietary business simply because the city permitted such power to heretofore lie fallow.

For all of the foregoing reasons we are of the opinion that the plaintiffs' complaints are without merit. Finally we may note that the technical objections which have been raised in this matter are designed to forestall benefit to the very class of taxpayers whom it is intended to benefit. A person who has already furnished his own meter in no event can complain as to an alleged loss of a meter he previously purchased since the city hereafter will replace and repair such meters without further charge to him. An injunction is granted out of equity as a matter of grace; in the exercise of such function as would not enjoin a program intended to benefit the taxpayer under the pretense that it damages him.

Wherefore we make the following

### Conclusions of Law

1. Water Rent Regulation No. 4 promulgated by the Water Commissioner of the City of Philadelphia

on February 14, 1953, does not violate the provisions of article I, sec. 1, of the Constitution of the Commonwealth of Pennsylvania which protects the right to acquire, possess and protect property or the provisions of the fourteenth amendment to the Constitution of the United States which prohibits the States from depriving any person of life, liberty or property without due process of law.

2. The said water rent regulation does not violate the provisions of article IX, sec. 7, of the Constitution of the Commonwealth of Pennsylvania which provides that the General Assembly shall not authorize any city to loan its credit to any corporation, association, institution or individual.

3. The said water rent regulation does not violate the Act of April 21, 1949, P. L. 665, sec. 18, which provides that no city shall engage in any proprietary or private business except as authorized by the General Assembly.

4. The said water rent regulation is not in conflict with the Act of June 7, 1911, P. L. 680, as amended by Act of July 2, 1935, P. L. 561, 53 PS §4071, entitled "An Act providing for the examination, licensure, and registration of persons, firms, or corporations engaged or engaging in the business or work of plumbing or house drainage"; the setting of a water meter by the City of Philadelphia was not intended to be prohibited by or encompassed by said act.

5. The provisions of said water rent regulation are authorized by and in conformity with the Act of May 12, 1925, P. L. 612, 53 PS §4191, which empowers cities of the first class to install water meters and require property owners to pay for the cost thereof.

6. The said water rent regulation is authorized by and in conformity with the provisions of Sections 5-800 and 5-801 of the Philadelphia Home Rule Charter.

7. The said water rent regulation does not discriminate against property owners who previously paid for the installation of water meters, insofar as it authorizes installment payments for installations hereafter to be made.

8. The said water rent regulation does not discriminate against persons who, in the past, have paid for repair or replacement of meters, insofar as it provides for maintenance hereafter of all meters regardless of when installed, at the expense of the city.

9. The cost to the city for such maintenance of meters is reasonably and equitably apportioned as between classes of consumers of water by the establishment of minimum rates for various sizes of meters.

10. The plaintiffs have failed to establish by satisfactory and credible evidence the existence of improper discrimination as to any water consumer.

11. The plaintiffs have failed to establish by satisfactory and credible evidence that the setting of water meters by the City of Philadelphia will cause any threat of contaminations to the city's water supply or danger of explosions or cross-connections.

12. The plaintiffs have failed to satisfactorily prove any basis for equitable relief and their complaint in equity should be dismissed.

Wherefore we enter the following

*Decree Nisi*

And now, June 17, 1954, upon consideration of the foregoing case, it is ordered, adjudged and decreed that the plaintiffs' complaint in equity be and it hereby is dismissed; the parties to bear their respective costs.

*Appendix A*
Water Department
City of Philadelphia
Regulation No. 4
Water Meters
Filed February 14, 1953

Under authority of section 5-801 of the Home Rule Charter, the following order involving a universal metering of water is established, effective January 1, 1953.

1. All water supplied to consumers from the city's water supply system, shall be metered, except in extraordinary circumstances, where, in the opinion of the water commissioner, metering would be impractical, and all consumers of water are required to furnish and install at their own cost and expense an approved meter or meters for such purposes.

2. In all premises where meters have been installed, such installation shall constitute compliance with paragraph 1 of this regulation.

3. The water department will maintain, repair, and, when deemed necessary, replace all meters without additional cost to the consumer, except where damage to such meter is caused by the consumer's negligence or failure to provide adequate protection for such meter.

4. All meters shall be set as near as possible to the point where water service line from the street main enters the consumer's property. The water department, however, may require the location of the meter in other locations for the purpose of accessibility.

5. The water department may cause a notice to be sent to consumers whose water supply is not presently metered, to install an approved meter within the time fixed in such notice. Such consumer may within the time fixed, cause such water to be installed by a private registered plumber at the sole cost and expense of the consumer.

If a meter is not installed within the time fixed, the water department may furnish and install such meter at the cost and expense of the consumer, and such cost and expense shall be a lien upon the property upon and for which the water meter shall have been installed and shall be collectible in the manner and be subject to the same penalties and interest now pro-

vided for the collection of excess water rents, except as provided in section 8 hereof.

The water department may shut off the supply of water to any consumer who has failed to install a meter within the time fixed by notice or who has refused to permit the water department to install a meter as herein provided.

6. A curb stop or shut-off valve shall be provided ahead of the meter on all service lines at the consumer's expense. Where such curb stops or shut-off valves are not installed, such installation will be required as part of the meter installation at additional expense to the consumer.

7. Defective or improper piping on the consumer's premises which affects or is affected by the installation of a meter, must be repaired or replaced by the consumer at his expense, before the installation of the meter.

8. The water department will cause bills to be sent to all premises in or for which the department has installed a meter, for the cost and expense thereof, including any additional piping or protection required, which bill may be paid without interest or penalty before the due date appearing thereon. Such due date shall be not less than thirty days from the date of issuance of such bill. The owner of such premises may exercise an option to pay such bill in three equal installments, the first installment thereof to be paid before the due date appearing on such bill; the second installment to be paid one year after the due date, and the third installment to be paid two years after the due date. Interest at the rate of six percent per annum shall be charged on all balances remaining unpaid after payment of the first installment.

9. The water department assumes no responsibility for the maintenance, repair, or replacement of sup-

plemental or special meters. All such meters must be installed so that they receive water only after the water has passed through and has been measured by the main meter receiving water from the city's main pipe of supply.

## OPINION

PER CURIAM, September 28, 1954.—Plaintiffs in these companion equity actions have filed 17 exceptions to the adjudication of the court dismissing the respective complaints. These exceptions and the arguments thereon restate the original contentions of petitioners, all of which were most carefully considered in the adjudication.

We have carefully considered the briefs of the parties and the law as reviewed by the chancellor and are of the opinion that the law has been correctly set forth; that there is little which we can profitably add to what has already been so fully stated in the adjudication. We have reviewed and examined the facts found by the chancellor and are of the opinion that all of such findings are amply supported by the competent and credible evidence adduced in the case. We have also reviewed and examined the inferences which the chancellor drew from the facts so found, the analyses he made of these and the conclusions he drew from them and concur therein. Finally, we have also reviewed and examined the conclusions of law reached by the chancellor and his orders dismissing plaintiffs' complaints and the reasons assigned therefor and the authorities relied upon and concur in such conclusions of law and the order made. Plaintiffs' exceptions are therefore dismissed and we enter the following:

## FINAL DECREE

And now, September 28, 1954, upon consideration of the foregoing case, it is ordered, adjudged and de-

creed that plaintiffs' complaints in equity filed in the above captioned cases be and they hereby are dismissed. The parties to bear their respective costs.